PEOPLE v McSWAIN

Docket No. 241275. Submitted August 6, 2003, at Grand Rapids. Decided
December 9, 2003, at 9:30 A M. Leave to appeal sought.

Rosemarie McSwain was convicted in 1988 by a jury in the Kent Circuit Court, Stuart Hoffius, J., of first-degree, premeditated murder and possession of a firearm during the commission of a felony. The Court of Appeals, MAHER, P.J., and SULLIVAN and REILLY, JJ., affirmed in an unpublished opinion per curiam (Docket No. 115067). The Supreme Court denied leave to appeal. 437 Mich 1029 (1991). In 2000, the circuit court, Paul J. Sullivan, J., granted a new trial in response to the defendant's motion for relief from judgment, determining that the defendant was afflicted with multiple personality disorder, later called dissociative identity disorder, at the time of the offenses and at the time of trial, which affliction might have had a bearing on issues of self-defense and mental competency. Judge Sullivan determined that it was incumbent on the defendant to demonstrate both good cause for the failure to raise the issue of mental illness in the original appeal and to demonstrate actual prejudice, and that the defendant had done so. The prosecution appealed.

The Court of Appeals held:

1. In order to be entitled to relief from judgment pursuant to MCR 6.508(D)(3), the defendant must demonstrate more than the failure at trial to recognize a reasonably discoverable mental illness because that failure is not enough to require a grant of postjudgment relief, especially many years after the trial. Newly discovered recognition of materiality of evidence is not the same as newly discovered evidence.

2. Pursuant to MCR 6.508(D)(3)(b)(i) and (iii), the defendant must show actual prejudice from the nonuse of the allegedly newly discovered evidence at trial, i.e., if the evidence at the hearing on the motion for relief from judgment were presented to the jury, a different result would have occurred. In this case, most of the evidence relates to the defendant's present mental condition and attempts to extrapolate backward to the time of the trial. There is no direct evidence on which the trial court could have based its decision. The opinion testimony of the defendant's expert wit-

nesses is speculative. The substance of the expert witnesses' testimony discussing the current mental health of the defendant as it relates to the defendant's mental state in 1988 is not compelling.

3. MCL 330.2020 provided the statutory standard for a lack of competence to stand trial. That statute required that the defendant was able to understand the charges against her and that she was able to assist in her own defense. Trial counsel testified that the defendant gave no indication at trial that she did not understand the charges against her, that the defendant knew she had the right to testify and chose not to, that the defendant gave counsel a witness list, and that defendant had carried on a colloquy with the court. Nothing in this testimony or that of the expert witnesses, either individually or cumulatively, could have led the trial court to rationally make a determination that the defendant's mental condition at the time of the 1988 trial would have prevented her from understanding the charges against her and from knowingly assisting in her own defense. There is nothing in the trial record that is so offensive to the maintenance of a sound judicial process that the defendant's conviction should not be allowed to stand.

Reversed.

MURRAY, J., concurring, stated that because facts were available to the defendant's trial counsel from which he could have argued that the defendant was incompetent to stand trial or that she acted in self-defense, and because case law existed at the time of the trial to support the legal theory behind those arguments, the defendant failed to establish the requisite good cause to warrant relief from judgment as required by MCR 6.508(D)(3)(a). The present arguments are about the materiality of the evidence being newly found, which is an insufficient basis for the grant of a new trial. The defendant also failed to explain why the motion was filed almost ten years after her conviction. Such long-delayed motions are looked on by the courts with disfavor.

1. CRIMINAL LAW — RELIEF FROM JUDGMENT OF CONVICTION — NEWLY DISCOVERED EVIDENCE — MENTAL ILLNESS.

In a motion for relief from judgment on the basis of newly discovered evidence of the defendant's incapacity to stand trial on the ground of mental illness, the failure to recognize at trial a reasonably discoverable mental illness is not sufficient to require a grant of postjudgment relief (MCR 6.508[D][3]).

2. EVIDENCE — NEWLY DISCOVERED EVIDENCE — MATERIALITY.

Newly discovered materiality of evidence is not the same as newly discovered evidence.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *William A. Forsyth*, Prosecuting Attorney, and *Timothy K. McMorrow*, Chief Appellate Attorney, for the people.

*John L. Grace, III*, for the defendant on appeal.

Before: WHITBECK, C.J., and SMOLENSKI and MURRAY, JJ.

WHITBECK, C.J. The prosecution appeals by leave granted the trial court's grant of defendant Rosemarie McSwain's motion for relief from judgment. The central issue in this case is whether McSwain was competent to stand trial for murder in 1988. Because we conclude that the trial court abused its discretion on the basis of a series of clear errors in the factual findings supporting its determination that McSwain was not competent, we reverse.

### I. BASIC FACTS AND PROCEDURAL HISTORY

#### A. McSWAIN'S CONVICTION

Following a seven-day trial in October 1988, in which fifty witnesses testified, a jury convicted McSwain of first-degree premeditated murder[1] and possession of a firearm during the commission of a felony.[2] The prosecution's theory of the case was that McSwain, a prostitute, shot and killed one of her customers because he refused to pay her for services. The defense theory of the case was misidentification and alibi. There is no indication in the record of any question concerning McSwain's mental capacity.

---

[1] MCL 750.316(1)(a).
[2] MCL 750.227b.

At the trial in 1988, Leveta Stewart testified that McSwain and a male fitting the victim's description came to her apartment on April 19, 1988. According to Stewart, McSwain asked her if "they could use a room." Stewart testified that she let McSwain and the victim use her bedroom. After fifteen to twenty minutes, McSwain and the victim came out of the room. Stewart testified that McSwain

> told the guy that he had wasted her time bringing her up there because they had agreed on whatever they agreed on. He's supposed to have gave [sic] her $50, and she told him that it was for him wasting her time. She said he was going to give her something for wasting her time, and that it was going to be his ass or hers . . . .
>
> * * *
>
> At that time the man was saying he didn't have any money. He said he didn't have any money or whatever else he said, which I didn't understand.
>
> So Rose had went [sic] in her purse and pulled out a gun, and she put it on his privates.

Stewart testified that after McSwain placed the gun on the victim's penis, she stated that "[s]he was going to blow his nuts off." Stewart stated that she took the gun away from McSwain, putting it in McSwain's purse. Stewart further stated that as McSwain and the victim left, McSwain stated that "she was going to blow his head off . . . ." Stewart testified that she took McSwain's comment as a joke, because she did not know McSwain to be a violent person.

Margaret Gillis testified that as she left work on April 19, 1988, she noticed a car with a man and a woman sitting inside who fit the description of the victim and McSwain, and that they appeared to be

talking. As Gillis walked toward her car, she heard a noise that might have been a car backfiring. When Gillis reached her car approximately twenty seconds later, she heard a second sound that sounded the same as the first. Gillis said that she then saw a car rolling backward down the street with "the passenger door open wide, and this man in the car in the driver's side." As the car rolled closer to her, she saw "the man from behind the steering wheel ha[d] blood trickling from down the right side of his face." The car eventually came to a stop when it hit a telephone pole. Gillis went back inside her place of work to call 911.

Dr. Stephen Cohle, a forensic pathologist, performed an autopsy on the victim and determined that the cause of death was a gunshot wound to the head and a gunshot wound to the right arm and chest. Dr. Cohle testified that the first bullet entered through the victim's right upper eyelid and was most likely fired from a range of six to twelve inches. The second bullet passed through the victim's right arm and into the right side of the chest, ultimately stopping in the victim's aorta.

Three of McSwain's cellmates at the Kent County jail testified that she had confessed to the murder. Carmen Williams testified that McSwain first claimed that she did not kill the victim, but later stated that she "didn't mean to do it . . . ." Sequita Eaves testified that she overheard McSwain say she "didn't mean to do it." Linda Nusbaum testified that she heard McSwain say that she "didn't mean to—for it to happen and that she was sorry . . . ."

The jury found McSwain guilty of first-degree murder and felony-firearm, and she appealed as of right

to this Court, raising six issues, none of which related to McSwain's mental capacity. This Court affirmed McSwain's convictions in an unpublished opinion per curiam.[3] The Michigan Supreme Court denied leave to appeal.[4]

### B. McSWAIN'S MOTION FOR RELIEF FROM JUDGMENT

In August 1998, McSwain moved for relief from judgment pursuant to MCR 6.500 *et seq.* She claimed, for the first time, that there "has been newly discovered evidence that [she] is affected by Multiple Personality Disorder, was so affected at the time of the crime and at the time of the trial, and is in need of highly specialized and intensive treatment." She claimed that this information was not available to her trial counsel for the purpose of preparing a defense. She asked that the judgment of sentence be set aside pursuant to MCR 6.500 *et seq.*, because she "was incompetent to stand trial; she was not available to consult with her attorney and help him prepare a defense, even though it is now evident that self-defense was available to justify the killing." She stated, "It is also probable that the core personality was not present for a portion, or for all, of the trial." Citing MCR 6.508(D)(1) and (2), she stated that she "could not have presented evidence of multiple personality disorder because it was not available to her at the time of trial; it is newly discovered evidence, and may be raised at this time."

---

[3] Unpublished opinion per curiam, issued October 8, 1990 (Docket No. 115067).

[4] 437 Mich 1029 (1991).

Citing *Rogers v Howes*,[5] McSwain asserted in her motion that, because MCR 6.500 created a procedural bar that was not firmly established and regularly followed at the time of her conviction, there was no need for her to show cause and prejudice. Alternatively, she asserted that she was permitted to raise her claim under the general requirements for relief found at MCR 6.508(D), noting in a footnote and citing MCR 6.508(D)(3)(b), that the court may waive the good cause requirement if it concludes there is a significant possibility that the defendant is innocent. Finally, she asserted that she was actually innocent of the charges stating that "she, Rosemarie McSwain, did not commit them; whatever alter [meaning alternative personality] did commit them was acting in self-defense" and that under these circumstances "the good cause requirement can be waived."

### C. THE EVIDENTIARY HEARING

#### 1. OVERVIEW

The trial court held an evidentiary hearing on McSwain's motion for relief on October 2 and 3, 2000. McSwain presented five witnesses in addition to herself: Thomas Parker, her trial counsel at her 1988 trial; Debra Caratonni, her cellmate; Dr. Greeley Gregory Miklashek, a practicing psychiatrist at Forest View Hospital in Grand Rapids; Dr. Steven Miller, director of the Michigan Institute for Forensic-Clinical-Neuro Psychology; and Ms. Leslie Pielack, a certified social worker and licensed professional counselor at Lake Orion Psychological Services. The

---

[5] 144 F3d 990 (CA 6, 1998).

prosecution presented one witness: Dr. Arthur Marroquin, the assistant director of the evaluation center at the Center for Forensic Psychiatry.

In her opening statement at the evidentiary hearing, counsel for McSwain indicated that "what we're really talking about here is whether Rosemarie McSwain had a fair trial, and it's my contention that there is no way she had a fair trial" because she "did not have executive function at the time of the killing" and that one of her alternative personalities "came out in a moment where it was perceived self-defense was necessary, and this was a self-defense killing." Counsel indicated that "there was no competency at the time of the trial, and as the Court knows, that is a claim that can be brought up anytime, that is constitutional in nature, it is absolutely fundamental, it is not governed by Michigan court rules or statutes, it is U.S. Supreme Court constitutional law."

The prosecution took a different view. In his opening statement, the prosecutor stated that the issue was whether McSwain could carry her burden of showing that she was not competent to stand trial at the time of the trial or "[whether] she would have been able to prevail [using] an insanity defense." The prosecutor emphasized that the evidentiary hearing on McSwain's motion for relief from judgment was not for the purpose of making "an inquiry as to whether or not 12 years later someone can conclude that there may have been a self-defense claim available."

Much of the testimony at the evidentiary hearing concerned dissociative identity disorder, formerly

known as multiple personality disorder.[6] In 1987, the American Psychiatric Association classified multiple personality disorder as a dissociative disorder.[7] In 1994, multiple personality disorder was renamed dissociative identity disorder,[8] which is characterized by "[t]he presence of two more distinct identities or personality states that recurrently take control of the individual's behavior accompanied by an inability to recall important personal information that is too extensive to be explained by ordinary forgetfulness."[9]

### 2. TESTIMONY OF THOMAS PARKER

Parker testified that he had been the chief trial attorney for the Kent County Office of the Defender for twenty-three years and had handled over four thousand felony cases. Parker testified that he was assigned to handle McSwain's case in 1988 and that the first time he visited her in jail, "[s]he was a relatively pretty young lady, a shy, tended to be coy maybe in there, very pleasant." Parker stated that McSwain "really wasn't helpful" regarding the case, "because she said she basically didn't know anything about it." Parker testified that his subsequent meetings with McSwain were "considerably different," because "she was extremely forward, brazen, brassy," and "constantly saying 'I didn't do it.' " According to

---

[6] See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (Washington, DC: American Psychiatric Press, 4th ed, 1994), p 484.

[7] See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (Washington, DC: American Psychiatric Press, 3rd ed, 1987), p ___.

[8] See *Diagnostic and Statistical Manual of Mental Disorders* (4th ed, 1994), *supra*, p 477, and the text revision published in 2000.

[9] *Id.*

Parker, McSwain "was of no help really whatsoever,"
because he got "nothing from her" as far as informa-
tion with which to fashion a defense strategy. During
trial, Parker stated, McSwain "just sat there." Parker
testified that he tried to explain the trial process to
her, but "there was nothing there to indicate to me
that at the time, that she didn't understand or that she
did." Parker commented:

> It is rare to get a client that comes up like a blank wall,
> so to speak, where their cooperation is useless. Usually you
> can get, you know, something. It does happen occasionally
> but it is extremely rare. And that was essentially what I got,
> nothing from her, so we defended the case on basically
> attacking the proofs that were in the case, and try to come
> up with some alternative explanation of how this person
> got shot besides her doing it.

Parker testified that he had never encountered mul-
tiple personality disorder or dissociative identity dis-
order. His experiences were mainly with schizophren-
ics, schizophrenic-paranoids, or manic-depressives.
Although Parker had requested competency examina-
tions "many times" before, he did not request one for
McSwain. Parker testified that McSwain gave no indi-
cation that she did not understand that she was on
trial for first-degree murder. According to Parker,
McSwain never claimed that she acted in self-defense;
instead, she consistently maintained that she "didn't
do it."

On cross-examination, Parker stated that McSwain
did not do anything that manifested, or that he
believed might be, mental illness. He said she did not
give any indication that she did not understand that
she was being tried for first-degree murder. With
respect to McSwain's decision not to testify, he recal-

led nothing in the colloquy with the trial court on this subject that would have indicated she did not understand that she had the right to testify. He noted that McSwain never mentioned anything about acting in self-defense.

### 3. TESTIMONY OF DEBRA CARRATONI

Debra Carratoni testified that she had known McSwain for six years and had met her at Scott Correctional Facility where she was serving five to fifteen years for embezzlement. Carratoni testified that she and McSwain attended the same vocational and college classes, so she "virtually was able to observe [McSwain] daily, hourly." Carratoni testified that, while she was "not a clinician," there was "something peculiar" about McSwain, and that she and the other cellmates "never really knew who [they] were gonna see." For example, according to Carratoni, McSwain would wear a ball gown and an extravagant hairdo on a hot summer day, rearrange a room full of heavy desks in order to placate an "extremely anal-retentive [sic]" graphic arts instructor, and wake up in the middle of the night to color with crayons on construction paper, the walls, and the floor. Carratoni testified that McSwain's demeanor and features would change during the day: "I would see changes in her facial muscles, her hair, just everything, her mannerisms." Carratoni testified that McSwain "can be very childlike," but that the "childlike demeanor would evaporate when an authority figure" came around. Carratoni testified that McSwain introduced herself as "Bambi," and that she only referred to McSwain as Bambi. However, Carratoni indicated that she was always able to communicate with McSwain while McSwain

was in "different demeanors" that McSwain had named Rose, Rosemarie, Passion, Marie, Maria, Gemini Light, and Gemini Dark.

### 4. TESTIMONY OF DR. GREELEY GREGORY MIKLASHEK

Dr. Miklashek testified that he interviewed McSwain on September 23, 2000, for one hour and ten minutes, and stated that "everything that [he] saw confirmed that [she] has DID [dissociative identity disorder]" and that he only needed about ten minutes of the interview to confirm that. Dr. Miklashek believed one of McSwain's alternative personalities was created during an abuse episode when she was three years old. According to Dr. Miklashek, McSwain described eight alternative personalities to him: "Bambi" (age 19); "Lucy" (age 43, but Dr. Miklashek stated, "I wonder if she is not actually significantly younger than 43"); "Gemini Dark" (age 47); "Gemini Light" (age 19); "Rose" or "Baby Rose" (age 3); "Rosemarie" (age 16); "Maria" (age 17); and "Passion" (age 18). Dr. Miklashek believed "Bambi" to be McSwain's "co-host" and described "Bambi" as "quite mature" and "thoughtful." Dr. Miklashek believed "Lucy" to be McSwain's "anger alter," who "strikes out when necessary." Dr. Miklashek described "Lucy" as the protector of "Rose," "Rosemarie," and "Gemini Light." Dr. Miklashek noted that the "protective alter and angry alter are almost synonymous, they are almost always the same." Dr. Miklashek said he "would be flabbergasted if this had not been going on since the abuse began, because that's when it always starts. It's a fragmentation of consciousness that occurs at the time of the abuse experience," but stated that he did not ask

McSwain in detail about "how far back she remembered being like this."

Dr. Miklashek testified that when he discussed the murder with McSwain, "she appeared to switch into the Lucy alter with a rather dramatic change in facial expression, which was maintained as long as the Lucy alter was forward." According to Dr. Miklashek, McSwain told him that "Lucy" came forward during the murder because she thought the victim "was going to kill Rosemarie." Dr. Miklashek continued:

> [McSwain] continued to express remorse for the death of the man she's alleged to have shot and his children, and also remorse for her impact on the body and other alters winding up in prison as a result of her aggressive act. She also stated, quote, "We didn't correspond and share the way we do now."
>
> To elaborate just a little on that, so [sic] what I understand her to be saying is that Lucy is a protector, which she had described and it's in the previous paragraph. She's a protector of Rose and Gemini Light, I have [sic]. Her babies, her special children. And I believe that—I know that also includes Rosemarie is [sic] someone that she looks out for, is protective of. So my understanding of it is that she was afraid that Rosemarie was going to be killed, and her job is to literally protect with her own life these other parts, and that's what she did.
>
> When I at other times asked Bambi what she remembered about those events, she described this as—and I'm quoting again—as the, quote, terrible event, close quote, and further stated, "Regarding a recall, it's like flicks, pieces."

Dr. Miklashek stated that McSwain remembered her pretrial experience as "sort of . . . a package" in which all of her "executive" alternative personalities were gone, that "[t]hey had retreated internally." Regarding McSwain's statements at the trial that she

understood she had a right to testify on her own behalf, Dr. Miklashek stated that although it "[was] an adult person that's sitting there," "child alters were occupying the body at that time, and . . . she had very little capacity for social judgment or to understand what was happening to her at that time. They were just there to be abused."

On cross-examination, Dr. Miklashek admitted that he did not review the transcript of the trial, that he did not review any police reports, that he did not review any of McSwain's psychiatric history, and that he had not reviewed the Michigan statute concerning competency to stand trial or the Michigan standard on insanity. When asked whether he would need to know the Michigan definition of insanity before making a statement about the clinical functioning of a patient, Dr. Miklashek responded, "Is 'hell, no' too strong?" He also stated that persons with dissociative identity disorder can function and finish a class in school, operate in a profession, and make rational decisions.

### 5. TESTIMONY OF DR. STEVEN MILLER

Dr. Miller testified that he performed two evaluations on McSwain: a normal psychological mental state evaluation and a forensic evaluation. The purpose of these evaluations was to determine whether McSwain suffered from a mental disorder that reached the level of the legally defined concept of insanity and whether she had a legally defined mental illness. Dr. Miller reviewed the records of McSwain's psychiatric history, but did not read the trial transcripts or police reports before evaluating her. Dr. Miller testified that defense counsel introduced him

to McSwain at a brief meeting in January 1997, and that he evaluated her on three different occasions in March 1997 for a total of seven to 7½ hours.

Dr. Miller testified that he believed that McSwain developed various personalities at different times in her life "in order to deal with different kinds of trauma and different kinds of situations she was in." Dr. Miller believed that McSwain's personality split when she was three or 3½ years old, forming "Baby Rose." As a teenager, "Rosemarie" developed as "more of a core personality, who was a very passive, depressed, suicidal teenager . . . ." "Bambi" was "kind of a street-slick prostitute type." "Passion" was a "sexual person" who according to McSwain, was "somebody that led me to try to normalize sexuality and make me feel good about sexuality." "Lucy" was the "angry personality" who "was considered the hard, tough, street-wise personality, who would get things done" and whose function was to "deal with difficult situations." Dr. Miller believed that "Lucy" committed the murder to protect "the system" (i.e., her alternative personalities) and that "Lucy" felt remorse as to how her decision to kill the victim affected "the system."

Dr. Miller concluded that there was "very little doubt" that McSwain suffers from dissociative identity disorder because she met all the diagnostic criteria for the disorder. Dr. Miller testified that there was a "very high probability" that McSwain suffered from dissociative identity disorder in 1988 and that she was incompetent to stand trial and not legally responsible for the crime. Dr. Miller "extrapolated" back to 1988 and reasoned that McSwain

likely suffered from DID from childhood, so therefore she
likely suffered it at that time, and that given that, she would
not have had reasonable access to all of the memories she
needed in order to assist her defense counsel in making a
reasonable mental state reconstruction of what happened.

However, Dr. Miller testified that a person with disso-
ciative identity disorder could be competent to stand
trial and believed that McSwain was currently compe-
tent to stand trial, because, he explained, "through
the interventions of the different clinicians that have
seen her, we've helped her to sort out her system,
she's been able to tell a coherent story, we've been
able to provide her counsel with a reasonable expla-
nation of what went forward . . . ."

On cross-examination, Dr. Miller stated that he did
not read the transcript of the trial, that he did not
read any police reports about any prior contacts
McSwain had with the police, that he saw nothing
strange or unusual in McSwain's colloquy with the
trial court about her decision not to testify, and that
there was no suggestion that McSwain had used any
alias other than "Bambi" in connection with her arrest
for the murder.

### 6. TESTIMONY OF LESLIE PIELACK

Pielack testified that she twice interviewed
McSwain. Pielack recounted McSwain's history,
including abuse beginning at age three or four, and
continuing into her teenage years; psychiatric hospi-
talization at age twelve; additional hospitalizations
during her teenage years for depression, suicide, and
drug use; and a series of sexually abusive relation-
ships with various men, including her stepfather. Pie-
lack testified that McSwain exhibited signs of amne-

sia, one of the criteria for dissociative identity disorder. Pielack testified that McSwain's demeanor changed several times during the interview:

> There existed a change of eyeglasses, change of facial expressions consistent with different identities, postures, different figures of speech, different voice patterns, different use of slang, and dialect change, alternation from a matter of fact demeanor to a bright demeanor to a suspicious, angry and hostile demeanor, et cetera. And that's all during one interview.
>
> [McSwain] would take her glasses off because all of a sudden she would not be able to be using them very well. She would comment upon her clothes in a surprised way, like "What am I doing wearing this? I don't wear things like this. This is not what I would choose to be wearing."

Pielack believed that McSwain started developing alternative personalities at a very young age and that "Lucy" came into being around age twelve. Pielack noted that "Lucy" "presents herself as very, take care of business, not put up with anything from anyone, and a very assertive, aggressive kind of part of self." Pielack testified that "Lucy" emerged and committed the murder to protect McSwain.

On cross-examination, Pielack stated that she did not review the trial transcripts, police reports, any prior police contacts that McSwain may have had, or any documents relating to McSwain's admission to the Huron Valley Center in 1997 before interviewing McSwain. Indeed, in her direct testimony, Pielack outlined her view on the need to review a person's mental health history, her criminal history, and past police reports and legal documents:

> I think that information is usually elicited in the psychiatric history taking. Part of the history—part of the interview

is to assess historical information, you know, how old are you, how many brothers and sisters do you have, where did you grow up, you know, what kinds of things have happened in your life. And any kind of legal history is usually asked about, you know, and the person reports that like they would report anything else about themselves, so it's just another piece of information. In terms of seeking, you know, formal documents, it's not necessary in a clinical interview. It really is not, because the clinical interview is not about that, it's about this clinical presentation now.

Pielack also stated that she would find it significant that McSwain told the treating psychiatrist at the time of her admission in 1997 that she had been given a diagnosis of multiple personality disorder. She further stated that the stress associated with killing someone or being on trial for murder would very possibly make the symptoms of dissociative identity disorder worse. On the question of McSwain's mental capacity at the time of the trial in 1988, Pielack responded to the prosecutor's question as follows:

Q. What you're saying, then, and I don't mean to put words in your mouth, and correct me if I'm wrong, what you are saying is that if she had this in '97 at the time you diagnosed her, she had it in '88?

A. If it's a valid diagnosis, the likelihood is very good, yes.

### 7. TESTIMONY OF ROSEMARIE McSWAIN

McSwain testified about sexual abuse she experienced during her childhood. She recounted that her stepfather sexually abused her when she was ten years old by taking her to a shed, tying her up, and forcing her to have oral, anal, and vaginal sex with him. She testified that her stepfather burned her legs with cigarettes, and she showed the scars to the trial

court. She recalled her stepfather hanging her upside down. She recounted another incident in which she was injured when her stepfather inserted a pop bottle into her vagina.

### 8. TESTIMONY OF DR. ARTHUR MARROQUIN

Dr. Marroquin testified that he interviewed McSwain three times, pursuant to the trial court's order to evaluate her for competency to stand trial and for criminal responsibility. Dr. Marroquin stated that he reviewed the trial transcripts, police reports, and records of McSwain's psychiatric treatment. He noted that it was important to review such records "[b]ecause the forensic examination, unlike an ordinary clinical examination, requires that you have multiple sources of information for reaching conclusions about a particular individual." He described McSwain as follows:

> Her appearance and demeanor were, I thought, unremarkable. She presented as apparently adequately groomed, clean, dressed in prison clothing, looked her age, was rather unremarkable in presentation and demeanor altogether.

Dr. Marroquin testified that McSwain indicated that dissociative identity disorder was a problem she had experienced for "most of her life, at least back into adolescence, and that she had only learned about it in her adulthood . . . ." He stated that McSwain described to him "how she had various personalities within her personality that were at different times in control of her." Dr. Marroquin noted that he did not see any changes in McSwain's demeanor as she was talking, nor did he see anything that would indicate a

different personality coming out. Dr. Marroquin testi-
fied that McSwain's psychiatric records from January
1997 indicate that she told her treating psychiatrist
that "she had been previously diagnosed with multiple
personality disorder by Dr. Miller."

Dr. Marroquin testified that McSwain recounted the
events of the murder and made reference "to different
personalities coming out and being concerned that
she was gonna get killed, . . . that she needed protec-
tion, and so on and so forth." Dr. Marroquin opined:

> Well, my conclusion is that this is a way of talking about
> it after the fact. It's not to say that this is how it actually
> was at the time. And I think the weight of the information
> does not support the conclusion that she has a multiple per-
> sonality disorder, I think this is just after-the-fact rational-
> ization.

Dr. Marroquin noted that McSwain signed prison
forms "in which she identified herself by her own
name, not someone else's name, not some alleged
alter identity." He stated that if someone "is asked
their name and identity and responds with their
appropriate name and identity, then they seem to
know who they are, and I wouldn't make anything
more about it than that."

Dr. Marroquin concluded that McSwain was not
mentally ill and that she was competent to stand trial
when he interviewed her, as well as in 1988. Dr. Mar-
roquin based his conclusion in part on the trial tran-
scripts, which, in his opinion, "did not support the
presence of some mental condition that would have
prevented her from understanding the nature and
object of the charge or rationally assisting counsel."
According to Dr. Marroquin, McSwain told him that

she had provided defense counsel with names of witnesses to call; Dr. Marroquin believed this to be significant in the forensic context because it "[t]ells me they were working together." Dr. Marroquin also stated that McSwain told him that she had discussed a plea bargain with her attorney, and that in hindsight, she "[t]hought it was a big mistake" not to enter a plea. Dr. Marroquin testified that when the trial court questioned McSwain regarding her decision not to testify, "[s]he was responsive to being addressed by the Court in what appeared to be an appropriate manner." In Dr. Marroquin's opinion, this was significant because it is not unusual for people with "genuine mental conditions to manifest these conditions in the courtroom, either by speaking up inappropriately or having to be cautioned to remain seated . . . ." He reasoned that, because McSwain did not manifest any conditions of mental illness during the colloquy with the trial court, she was not mentally ill.

> *Q.* If she had been mentally ill at the time of your interview, would you have expected to see something that was remarkable?
>
> *A.* Absolutely.
>
> *Q.* If she had any dissociative disorder of any kind, would you have expected to see something?
>
> *A.* I would expect so, given the amount of time we spent together, yup.

Dr. Marroquin testified that he did not see any indication that McSwain was suffering from a dissociative disorder of any kind. He noted that "people with genuine mental conditions may try to control and disguise them, but if they actually have them, it's very difficult to disguise them for a protracted period of time." He disagreed with the defense expert witnesses

that someone with dissociative identity disorder could appear normal and function in everyday activities such as school and work:

> I think it's very unlikely. I think that this would be a very disabling condition if you really had it. That it would prevent a person from doing most of the things that ordinarily you have to do to live, work, be in relationships, and so on and so forth. I think it would be very difficult to completely keep it under wraps, so that even a layman interacting with the person would not come away from the interaction saying "There's really something the matter with this person."

### D. THE TRIAL COURT'S OPINION

In August 2001, the trial court issued an opinion and order granting McSwain's motion for relief from judgment. The trial court detailed the testimony of each of the witnesses before setting forth its opinion, then stated:

> This court is extremely reluctant to open up once again a murder case that was tried before a jury some eleven years ago. The court fully recognizes the need for finality. Similarly, the court is of the opinion that medical evidence involving psychiatric conditions is not always as objectively reliable as other types of medical testimony. Furthermore, given the offense for which defendant was convicted, and the life sentence with no possibility of parole necessarily imposed following trial, defendant has nothing to lose by bringing this motion, and everything to gain. Defendant could well be scamming the court and the system.
>
> On the other hand, defendant through very competent and diligent counsel presented a compelling case that she had and continues to have several distinct personalities. Until hearing the evidence presented, this court would have been very much inclined to dismiss as psycho-babble the claims presented by defendant. In the end, justice and fair-

ness is every bit as important to the system as is finality and convenience. If defendant is scamming the court, she is doing so only after convincing two attorneys, four mental health professionals, and a close friend that she has a mental illness (DID), and that such illness made her incompetent and criminally not responsible at time of the offense and trial in question.

The trial court noted that McSwain had the burden of establishing entitlement to the relief requested pursuant to MCR 6.508(D), and stated that "since defendant's conviction has been appealed and decided adversely to her by both the Michigan Court of Appeals and the Michigan Supreme Court, it is incumbent upon her to demonstrate both good cause for failure to raise these issues on appeal as well as actual prejudice. MCR 6.508(D)(3)(a)&(b)."

The trial court then found that McSwain established good cause for not raising the issue earlier:

At time of trial, DID was not even a recognized diagnosis. Actual DID is extremely rare, according to the expert witnesses presented. Also, in view of the characteristics of DID, it would have been quite difficult for trial and/or appellate counsel to recognize the potential disability, because relevant personalities likely withdrew at the time for reasons stated by the experts. Even if defendant at times cooperated with counsel, and appropriately addressed the court about such decisions as turning down an offered plea bargain, there is considerable question as to which personality was speaking or acting at the time.

The trial court also found that McSwain demonstrated actual prejudice from the alleged irregularities that support the claim for relief, pursuant to MCR 6.508(D)(3)(b)(iii):

The actual prejudice requirement presents a more substantial question. There is little doubt from the evidence that one of defendant's personalities or alters killed the victim. The People understandably suggest the likelihood of post-facto fabrication, and even question the validity of a DID diagnosis since such is not uniformly recognized by all mental health professionals. The forensic review performed by the People's expert, Dr. Marroquin, included a more thorough review of the trial record, and other factors normally important in forensic examination. Nonetheless, in hearing the testimony of three mental health professionals presented live by the defense, and in reviewing the information contained in an affidavit of a fourth, and in applying additional evidence presented by lay witnesses, this court is left with a distinct impression that defendant may well not have been competent at time of trial, and perhaps not criminally responsible. Defendant's experts were united in their opinions. Some were preeminent in the field of DID. All suggested that defendant's case was among the most severe they had ever observed. And without questioning the general qualifications of the prosecutor's expert, because he is extremely well-qualified in the field of forensic psychiatry, his experience and training in the field of DID paled in comparison.

In short, the quality and quantity of expert evidence submitted by defendant, coupled with the strength of the experts' convictions, convinced this otherwise dubious court that had such compelling evidence been presented to the judge and/or jury at time of trial, there is substantial likelihood that defendant would have been declared incompetent, and a reasonable likelihood that the jury would have decided the case differently. In view of this, justice dictates that defendant be given the opportunity to present such evidence at a new trial.

## The trial court concluded:

The court recognizes the practical difficulties that could face prosecutors called upon to relitigate a matter some eleven years after the fact. Witnesses disappear, memories

fade, and tangible pieces of evidence may no longer be available. Granting of defendant's motion is not something this court takes lightly. In this case, however, evidence appears to remain strong and viable that the person of defendant Rosemary McSwain pulled the trigger that caused the death of the victim. Defendant does not really deny this. The only material issue relates to defendant's alleged DID, and its impact, if any, upon her competency and criminal responsibility. As has been evidenced by this two day hearing, both sides are well able to present and argue their respective positions as needed. Justice dictates that said be done.

## II. MCR 6.508

### A. OVERVIEW

It is well settled that

[s]ubchapter 6.500 of the Michigan Court Rules establishes the procedures for pursuing postappeal relief from a criminal conviction. The subchapter is the exclusive means to challenge a conviction in Michigan once a defendant has exhausted the normal appellate process. Relief, however, may not be granted unless the defendant demonstrates (a) good cause for failure to have raised the grounds for relief on appeal or in a prior motion under the subchapter and (b) actual prejudice from the alleged irregularities that support the claim for relief. MCR 6.508(D)(3)(a) and (b).[10]

Here, there is little question that McSwain seeks relief from judgment within the scope of MCR 6.500 *et seq.* Further, her central contention in her motion before the trial court for relief from judgment was that she was incompetent to stand trial in 1988 and that she was not available to consult with her attor-

---

[10] *People v Watroba*, 193 Mich App 124, 126; 483 NW2d 441 (1992).

ney and help him prepare a defense. The reason for this, according to McSwain, was that she suffers now, and suffered at the time of trial, from a mental incapacity now known as dissociative identity disorder. While she also asserted that another of her various personalities, apparently "Lucy," actually committed the murder as a form of self-defense, this was not her central contention at the evidentiary hearing, nor is it her central contention in this appeal. Further, the trial court addressed only the incapacity issue in its opinion and therefore it is this issue, whether viewed under the rubric of newly discovered evidence or simply through the structure of MCR 6.508, that is before us. We take the latter approach and therefore turn first to the language of the court rule.

B. THE LANGUAGE OF MCR 6.508

MCR 6.508 is phrased in the negative and sets out three bars to relief from judgment. The first bar, under MCR 6.508(D)(1), is that a court may not grant relief from judgment if the criminal defendant's motion seeks relief from judgment of conviction and sentence that still is subject is to challenge on appeal under MCR 7.200 or MCR 7.300. This bar is not applicable here; McSwain's judgment of conviction and sentence is not now subject to challenge on appeal pursuant to MCR 7.200 or 7.300.

The second bar, under MCR 6.508(D)(2), is that a court may not grant relief from judgment if the criminal defendant's motion alleges grounds for relief that were decided against the defendant in a prior appeal or proceeding under MCR 6.500, "unless the defendant establishes that a retroactive change in the law has undermined the prior decision." This bar is also

not applicable here; McSwain's motion did not allege grounds that were decided against her in a prior appeal or proceeding under MCR 6.500.

The third bar, under MCR 6.508(D)(3), is that a court may not grant relief from judgment if the criminal defendant's motion "alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under" MCR 6.500. This bar clearly applies here as McSwain could have, but did not, raise the issue of her alleged mental incapacity in her prior appeal from her conviction and sentence. However, a criminal defendant can avoid the application of this bar if that defendant demonstrates:

> (a) good cause for failure to raise such grounds on appeal or in the prior motion; and
>
> (b) actual prejudice from the alleged irregularities that support the claim for relief.[11]

The rule then defines "actual prejudice":

> (i) in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal;[12]
>
> *        *        *
>
> (iii) in any case, the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case . . . .[13]

---

[11] MCR 6.508(D)(3).

[12] MCR 6.508(D)(3)(b).

[13] *Id.*

The court rule also provides that the criminal defendant has the burden of establishing entitlement to the relief requested and that the court may waive the "good cause" requirement of MCR 6.508(D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.[14] Here, as we note above, the trial court found that McSwain had demonstrated both "good cause" for failing to raise the mental incapacity ground in her previous appeal and "actual prejudice." The next step in our analysis, therefore, is our consideration of the standard against which we review these findings.

### III. STANDARD OF REVIEW

#### A. OVERVIEW

It is well established that we review a trial court's grant of relief from judgment for an abuse of discretion[15] and that we review a trial court's findings of fact supporting its ruling for clear error.[16] These simple statements, however, mask myriad complexities. The first such complexity occurs at the threshold and relates to the proper order in which we are to conduct this bifurcated inquiry. In some instances, statutory language and case precedent set the order; when reviewing a trial court's decision to sentence a minor as a juvenile or as an adult, for example, the appellate

---

[14] MCR 6.508(D)(3).

[15] *People v Ulman*, 244 Mich App 500, 508; 625 NW2d 429 (2001) ("A trial court's grant of relief from judgment is reviewed generally for an abuse of discretion," citing *People v Osaghae*, 460 Mich 529, 534; 596 NW2d 911 [1999], and *People v Reed*, 198 Mich App 639, 645; 499 NW2d 441 [1993], aff'd 449 Mich 375; 535 NW2d 496 [1995].).

[16] MCR 2.613(C). See also *People v Crear*, 242 Mich App 158, 167; 618 NW2d 91 (2000).

court first reviews the trial court's findings of fact for clear error and then reviews the ultimate decision for an abuse of discretion.[17] While there is no similar statutory direction when dealing with our review of a trial court's grant of relief from judgment, we believe that simple logic requires us first to consider a trial court's findings of fact and then to consider that court's ultimate decision.

B. REVIEWING A TRIAL COURT'S FINDINGS
OF FACTS FOR CLEAR ERROR

The second complexity relates to the "clearly erroneous" standard, one that is "easier to cite than to explain."[18] The classic formulation is that a trial court's findings of fact are clearly erroneous "if, after a review of the entire record, the appellate court is left with a definite and firm conviction that a mistake has been made."[19] This formulation derives from *United States v United States Gypsum Co*,[20] but in that case the United States Supreme Court "did little more than announce the 'firm and definite conviction' slogan without a great deal of elucidation."[21] Nonetheless, in Michigan, we have derived two general principles from *Gypsum*. The first is that reviewing courts give "less deference to the factual findings of trial

---

[17] See *People v Thenghkam*, 240 Mich App 29, 41-42; 610 NW2d 571 (2000), overruled in part on other grounds in *People v Petty*, 469 Mich 108; 665 NW2d 443 (2003). See also *People v Launsburry*, 217 Mich App 358, 362; 551 NW2d 460 (1996), *People v Lyons (On Remand)*, 203 Mich App 465, 468; 513 NW2d 170 (1994), and *People v Passeno*, 195 Mich App 91, 103; 489 NW2d 152 (1992), overruled in part on other grounds in *People v Bigelow*, 229 Mich App 218; 581 NW2d 744 (1998).

[18] *Thenghkam, supra* at 43.

[19] *People v Gistover*, 189 Mich App 44, 46; 472 NW2d 27 (1991).

[20] 333 US 364; 68 S Ct 525; 92 L Ed 746 (1948).

[21] *Thenghkam, supra* at 45.

judges than to the factual findings of juries, even though the trial court's findings still have 'great weight.' "[22] The second is that "a trial court's factual findings may be clearly erroneous even when there is some evidence to support them."[23] As this Court stated in *Thenghkam*:

> There are occasions, albeit relatively infrequent ones, when a trial court's assessment of those facts suffers from some shortsightedness. . . . In those circumstances where the trial court's findings do not accurately portray the factual background of the case, we conclude that the trial court "clearly erred."[24]

Overall, the clear error standard of review is highly deferential to the trial court; indeed, MCR 2.613(C) requires that regard be given to the "special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." However, "[t]he important lesson of *Gypsum* is that appellate courts need not refrain from scrutinizing a trial court's factual findings, nor may appellate courts tacitly endorse obvious errors under the guise of deference."[25]

Thus, here, we must scrutinize the trial court's factual findings and, while according those findings deference as required by the court rule, we are not to tacitly endorse obvious errors, or omissions, under the guise of that deference.

---

[22] *Id.* See also *Brady v Michigan Consolidated Gas Co*, 31 Mich App 498, 500 n 1; 188 NW2d 58 (1971) (Michigan's appellate courts traditionally exercise a broader review of a judge's decision than of jury verdicts).

[23] *Thenghkam, supra* at 45.

[24] *Id.* at 46.

[25] *Id.* at 47.

## C. REVIEWING A TRIAL COURT'S ULTIMATE DECISION
## FOR AN ABUSE OF DISCRETION

The third complexity relates to the abuse of discretion standard. It is, perhaps, helpful to think of this standard as a spectrum. The most deferential end of that spectrum is the formulation contained in *Spalding v Spalding*,[26] which states that an abuse of discretion occurs when the lower court's decision is "so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." Under this formulation, an appellate court is almost required, in order to reverse a trial judge's discretionary decision, to conclude that the judge literally had taken leave of his senses.

At the other end of the spectrum is the considerably less deferential formulation of the abuse of discretion standard contained in the recent case of *People v Babcock*.[27] There, Justice MARKMAN, writing for the majority, analyzed the abuse of discretion standard:

> At its core, an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome. See *People v Talley*, 410 Mich 378, 398; 301 NW2d 809 (1981) (LEVIN, J., concurring), quoting *Langes v Green*, 282 US 531, 541; 51 S Ct 243; 75 L Ed 520 (1931) (" 'The term "discretion" denotes the absence of a hard and fast rule.' "). When the trial court selects one of these principled outcomes, the trial court has not abused its discretion and, thus, it is proper for the reviewing court to defer to the trial court's judgment. An abuse of discretion

---

[26] 355 Mich 382, 384-385; 94 NW2d 810 (1959).
[27] 469 Mich 247; 666 NW2d 231 (2003).

occurs, however, when the trial court chooses an outcome falling outside this principled range of outcomes. See *Conoco, Inc v JM Huber Corp*, 289 F3d 819, 826 (CA Fed, 2002) ("Under an abuse of discretion review, a range of reasonable determinations would survive review."); *United States v Penny*, 60 F3d 1257, 1265 (CA 7, 1995) ("a court does not abuse its discretion when its decision 'is within the range of options from which one would expect a reasonable trial judge to select' ") (citation omitted).[28]

However, *Babcock* interpreted a statute and not a court rule; further, that statute dealt with sentencing. We conclude that if there is to be a decision to expand this formulation of the abuse of discretion standard beyond the statutory context of sentencing, that decision is appropriate for the Supreme Court, and not this Court.

Fortunately, there is a formulation of the abuse of discretion standard that is in the middle of the spectrum. Under this formulation, an abuse of discretion can be found only where "an unprejudiced person, considering the facts on which the trial court [relied], would find no justification or excuse for the ruling made."[29] It is this formulation that we consider to be appropriate for our review of the trial court's ultimate decision in this case.

### IV. THE TRIAL COURT'S FINDINGS

#### A. MCR 6.508(D)(3) REDUX

To review briefly, we are concerned here with the third bar to granting relief from judgment contained in MCR 6.508(D)(3). The court rule bars such a grant

---

[28] *Babcock, supra* at 269.

[29] *People v Williams*, 240 Mich App 316, 320; 614 NW2d 647 (2000).

if the criminal defendant's motion alleges a ground for relief, other than jurisdictional defects, that could have been raised on appeal from the conviction and sentence or in a prior motion under MCR 6.500. However, a criminal defendant can avoid the application of this bar if that defendant satisfies both of the following requirements:

> (a) [a demonstration of] good cause for failure to raise such grounds on appeal or in the prior motion,[30] and
>
> (b) [a demonstration of] actual prejudice from the alleged irregularities that support the claim for relief.[31]

### B. GOOD CAUSE

As noted above, the trial court found that McSwain established good cause for not earlier raising the issue of her alleged incompetence to stand trial. The trial court's reasoning is fairly thin on this point; essentially, the trial court reasoned that, since dissociative identity disorder was not a recognized disease at the time of McSwain's trial and since the characteristics of the disease would have made it difficult for trial and appellate counsel to recognize it, good cause existed for not earlier raising the defense of McSwain's incompetence to stand trial. This finding presumes that McSwain had dissociative identity disorder at the time of her trial. In our view, this finding has something of a "now you see it, now you don't" flavor to it. Any convicted criminal can, if the criminal can present evidence of a *current* dissociative identity disorder, claim that such a disorder existed

---

[30] MCR 6.508(D)(3).
[31] MCR 6.508(D)(3).

*in the past* but that, because of the characteristics of
the disease, it could not be identified. This opens a
rather obvious door for claims of incompetence to
stand trial that are based on a disease that was both
unrecognized and unrecognizable at the time of that
trial.

Further, we note that Parker testified that, at the
first time he visited McSwain in jail, she was "shy"
and "very pleasant." However, Parker then testified
that his subsequent meetings with McSwain were
"considerably different," because "she was extremely
forward, brazen, brassy . . . ." Thus, it could very well
be that, contrary to the trial court's conclusion, this
case is one in which trial counsel could have, but did
not, pick up on a potential insanity defense. This fail-
ure cannot be attributed to the fact that dissociative
identity disorder was not "a recognized diagnosis," as
the trial court put it, in 1988. Although dissociative
identity disorder did not exist by that name in 1988,
the symptoms that comprise it were then known as
multiple personality disorder, which was a well-estab-
lished diagnosis at that time. Failure to recognize a
reasonably discoverable mental illness is not enough
to require a grant of postjudgment relief,[32] especially
a number of years later.[33]

It is not necessary for us, however, to determine
whether the trial court's factual findings on the good
cause requirement were clearly erroneous. While it is
certainly possible to reach a firm and definite conclu-
sion that the trial court made a mistake in the way in

---

[32] See *Sellers v State*, 973 P2d 894, 895 (Okla Crim App, 1999).

[33] See *People v Jackson*, 465 Mich 390, 399 n 8; 633 NW2d 825 (2001)
(noting that "long-delayed motions seeking relief from convictions are
disfavored").

which it dealt with the good cause requirement, because we determine that McSwain did not meet her burden of demonstrating actual prejudice, we need not reach such a conclusion.

### C. ACTUAL PREJUDICE

#### 1. MCR 6.508(D)(3)(b)(i)

To establish actual prejudice under MCR 6.508(D)(3)(b)(i) McSwain must show that, "but for the alleged error," she "would have had a reasonably likely chance of acquittal . . . ." We conclude that this requires McSwain to show, first, that she had dissociative identity disorder in 1988 and, second, that the jury would have been reasonably likely to acquit her on that basis.

#### 2. MCR 6.508(D)(3)(b)(iii)

Alternatively, McSwain could also establish actual prejudice under MCR 6.508(D)(3)(b)(iii), which states that "actual prejudice" may be established by showing that "the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case . . . ." We conclude that, to meet her burden of showing actual prejudice under this definition, McSwain had to demonstrate two things. First, as with the previous definition, she had to demonstrate that she had dissociative identity disorder at the time of her trial in 1988. Second, she had to demonstrate that this condition rendered her incompetent to stand trial. Only if she met *both* requirements could the trial court appropriately find

that her conviction should not be allowed to stand because to do so would be "offensive to the maintenance of a sound judicial process . . . ."[34]

### 3. McSWAIN'S MENTAL CONDITION IN 1988

#### a. DIRECT EVIDENCE

There was precious little direct evidence before the trial court with respect to McSwain's mental condition at the time of her trial in 1988. Thomas Parker, McSwain's trial attorney, was the only person who gave any testimony based on observation of McSwain at that time; interestingly, although McSwain testified, none of her testimony related in any way to her mental condition in 1988. While Parker did state that he got nothing from McSwain to help him fashion his defense strategy and that she simply sat there during the trial, he also admitted that McSwain did not do anything that manifested, or that he believed might be, mental illness. There is, therefore, nothing in the testimony of either Parker or McSwain that the trial court could have relied on to make a factual finding that McSwain had any form of mental illness at the time of her trial.

#### b. EXPERT TESTIMONY

We are left, then, with the testimony of experts who interviewed McSwain years after she committed the crime for which she was convicted. Much of this testimony concerned McSwain's *current* mental condition, not her mental condition at the time of the

---

[34] MCR 6.508(D)(3)(b)(iii).

trial. With respect to McSwain's mental condition at the time of trial, Dr. Miklashek testified he "would be flabbergasted if this had not been going on since the abuse began, because that's when it always starts. It's a fragmentation of consciousness that occurs at the time of the abuse experience." However, he also stated that he did not ask McSwain in detail about "how far back she remembered being like this." Dr. Miller "extrapolated" back to 1988 and reasoned that because McSwain likely suffered from dissociative identity disorder from childhood, she likely suffered from it at the time of trial. Leslie Pielack testified that if she had correctly diagnosed McSwain with dissociative identity disorder in 1997, the "likelihood is very good" that she had the disease in 1988.

We recognize the difficulty that these experts faced in reaching conclusions about McSwain's mental condition in 1988. We understand that the diagnosis of mental illness is not an exact science and that there is always a certain amount of speculation and, indeed, extrapolation involved in making such diagnoses. Nevertheless, we are constrained to observe that, while the trial court was in the best position to make determinations regarding the *credibility* of these witnesses, the *substance* of their testimony about McSwain's mental condition in 1988 is less than compelling. Further, while the trial court did reach the conclusion that there was a substantial likelihood that McSwain would have been declared incompetent at the time of trial, it never explicitly and conclusively made a finding that McSwain suffered from dissociative identity disorder in 1988. Finally, the trial court appears to have, at least partially, improperly based its decision on the *number* of the expert witnesses

that McSwain presented rather than on the *substance* of the testimony of those witnesses.[35]

For these reasons, we are left with the firm and definite impression that, to the extent that the trial court actually made a decision that McSwain suffered from dissociative identity disorder at the time of her trial, that decision was a mistake. Simply put, there was no direct evidence on which the trial court could have based such a decision, and the opinion testimony of McSwain's experts was at best speculative and at worst after-the-fact extrapolation. Without more, this determination alone compels us to conclude that McSwain failed to establish actual prejudice under either definition.

### 4. McSWAIN'S COMPETENCY TO STAND TRIAL IN 1988

#### a. THE STATUTORY STANDARD

Even if McSwain had established that she suffered from dissociative identity disorder in 1988, she nonetheless could not have established actual prejudice under MCR 6.508(D)(3)(b)(iii). As noted, to establish actual prejudice under MCR 6.508(D)(3)(b)(iii), McSwain was required to show that dissociative identity disorder made her incompetent to stand trial. In 1988, the standard for competency to stand trial was set forth in MCL 330.2020, which provided:

> (1) A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his

---

[35] See *Horetski v American Sandblast Co*, 340 Mich 323, 329; 65 NW2d 702 (1954) ("The fact that one side presented more witnesses than the other side is not determinative of the weight of the evidence.").

mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial.

(2) A defendant shall not be determined incompetent to stand trial because psychotropic drugs or other medication have been or are being administered under proper medical direction, and even though without such medication the defendant might be incompetent to stand trial. However, when the defendant is receiving such medication, the court may, prior to making its determination on the issue of incompetence to stand trial, require the filing of a statement by the treating physician that such medication will not adversely affect the defendant's understanding of the proceedings or his ability to assist in his defense.

As stated by the Supreme Court in interpreting this language, a criminal defendant's mental condition at the time of trial must be such as to assure that he understands the charges against him and can knowingly assist in his defense.[36]

### b. DIRECT EVIDENCE

Again, there was little direct evidence concerning whether, in 1988, McSwain understood the charges against her and could knowingly assist in her defense. The direct evidence that exists does not favor McSwain. Thomas Parker testified that McSwain gave no indication that she did not understand that she was on trial for first-degree murder. With respect to

---

[36] See *People v Wright*, 431 Mich 282, 285-286; 430 NW2d 133 (1988) ("When a defendant's competency to stand trial is questioned, a competency examination is given to determine his mental state at the time of trial to assure that he understands the charges against him and can knowingly assist in his defense."), citing MCL 330.2020.

McSwain's decision not to testify, he recalled nothing in the colloquy with the trial court on this subject that would have indicated she did not understand that she had the right to testify. Although Parker testified that McSwain "was of no help" and he "got nothing from her," this was contradicted by Dr. Marroquin's recollection that McSwain told him she had given Parker names of witnesses to call.

c. Expert Testimony

Dr. Miklashek testified that people with dissociative identity disorder can function and finish a class in school, operate in a profession, and make rational decisions. Dr. Miklashek reacted with disdain when asked whether he would need to know the Michigan definition of insanity before making a statement about the clinical functioning of a patient, apparently believing such a definition to be irrelevant. Regarding McSwain's statements at the trial that she understood she had a right to testify on her own behalf, Dr. Miklashek stated that it "[was] an adult person that's sitting there," but opined that "child alters" were occupying McSwain's body at the time of trial, and that "she had very little capacity for social judgment or to understand what was happening to her at that time." However, Dr. Miklashek gave no inkling of how he had reached these rather extraordinary conclusions.

Dr. Miller testified that a person with dissociative identity disorder could be competent to stand trial; indeed, he believed that McSwain was *currently* competent to stand trial. Nevertheless, Dr. Miller testified that it was "very unlikely" that McSwain was competent to stand trial and not legally responsible for the

crime she committed, but again, there is little in the record to indicate the basis for this opinion. Leslie Pielack did not testify directly about McSwain's competency to stand trial in 1988; rather, her testimony related only to her belief that if she had diagnosed McSwain correctly in 1997, then the likelihood was very good that she had dissociative identity disorder in 1988.

Again, we recognize the difficulty these experts faced in rendering an opinion about McSwain's competency to stand trial years after that trial took place. However, we find *nothing* in this testimony, whether it is considered individually or cumulatively, on which the trial court could have rationally made a determination that McSwain's mental condition at the time of the 1988 trial was such that she did not understand the charges against her and could not knowingly assist in her defense. The trial court found that there was a substantial likelihood that McSwain would have been declared incompetent at the time of trial. We are left with the firm and definite conclusion that this finding was a mistake. Simply put, the direct evidence from McSwain's trial counsel indicated otherwise and the opinion testimony of McSwain's experts was purely speculative.

### D. CONCLUSION

To avoid the bar against granting postjudgment relief, a criminal defendant must demonstrate good cause for failure to raise the grounds for such relief on appeal or in the prior motion *and* demonstrate actual prejudice from the alleged irregularities that support the claim for relief. Here, reviewing the trial court's findings of good cause and actual prejudice

for clear error, we conclude that we need not reverse
the trial court's finding of good cause because we
conclude that the trial court was mistaken in its find-
ings with regard to actual prejudice. Specifically, we
conclude that there was no direct evidence on which
the trial court could have based its implicit decision
that McSwain suffered from dissociative identity dis-
order in 1988 and that the opinion testimony of
McSwain's experts was at best speculative and at
worst after-the-fact extrapolation. Further, we find
nothing in the record on which the trial court could
have rationally made a determination that McSwain's
mental condition in the 1988 trial was such that she
did not understand the charges against her and could
not knowingly assist in her defense. Overall, we find
nothing in the record that is so offensive to the main-
tenance of a sound judicial process that McSwain's
conviction should not be allowed to stand.

## V. ABUSE OF DISCRETION

We have concluded that the trial court's findings
with regard to actual prejudice were clearly in error.
We must next determine whether, in light of this con-
clusion, the trial court's ultimate decision to grant a
new trial was an abuse of discretion. We are cogni-
zant of the fact that a mere difference in judicial opin-
ion does not establish an abuse of discretion.[37] Never-
theless, we conclude that an unprejudiced person
considering the facts on which the trial court relied
would find no justification or excuse for the ruling
made. By this we do not mean to suggest that the trial

[37] *Alken-Ziegler, Inc v Waterbury Headers Corp*, 461 Mich 219, 227; 600
NW2d 638 (1999).

court's approach was unprincipled or that the trial court was less than conscientious; indeed, the record reflects careful, serious, and sincere deliberation by the trial court.

In this regard, we note that the trial court ultimately decided that there was a substantial likelihood that McSwain would have been declared incompetent to stand trial in 1988. The trial court based this decision on the testimony of McSwain's experts, who in turn based their determinations not on direct evidence but, rather, on speculation. These factual findings are at the core of the abuse of discretion formulation that we have used in our analysis and they are so clearly erroneous that they cannot provide a justification or excuse for the trial court's ruling.

On the basis of our analysis of the record before us and the factual findings underpinning the trial court's determination, we find nothing that is so offensive to the maintenance of a sound judicial process that McSwain's conviction should not be allowed to stand.

Reversed.

SMOLENSKI, J., concurred.

MURRAY, J. (*concurring*). I concur with the majority's conclusion that the trial court's order granting defendant's motion for relief from judgment should be reversed. However, in my view the trial court's order should be reversed on the basis that, as a matter of law, good cause did not exist for failing to previously raise this issue. MCR 6.508(D)(3)(a).

As the majority discusses, but does not decide, the record reveals that defendant seeks to present issues at a new trial that are based on facts and law that existed at the time of defendant's trial. For example,

defendant's trial counsel testified about various personality traits he encountered while interviewing defendant before trial. The sum and substance of that testimony was that defendant would on one occasion appear shy and reserved, while on another occasion she exhibited a brash and brazen personality. Defendant's trial counsel also testified that, during trial, defendant was essentially emotionless, thus exhibiting another different personality trait. Additionally, case law existed at the time of trial that recognized multiple personality disorder, now known as disassociative identity disorder. See, e.g., *State v Lockhart*, 208 W Va 622, 631-632; 542 SE2d 443 (2000), and the cases cited therein.

Because there were facts available to defendant's trial counsel from which he could have argued that defendant was incompetent or acted in self-defense, and because case law existed to support the legal theory behind such an argument, defendant failed to establish the requisite good cause to warrant relief from judgment. MCR 6.508(D)(3)(a); *Sellers v State*, 889 P2d 895, 897 (Okla Crim App, 1995) (holding that the defendant failed to establish "sufficient reason" to explain why he did not raise an insanity defense based on multiple personality disorder when the disorder, though relatively new at the time of trial, was reasonably discoverable); *Sellers v State*, 973 P2d 894, 895 (Okla Crim App, 1999) (denying postjudgment relief to the same defendant because the disorder could have been discovered by trial counsel at the time of trial). Indeed, when informed by defendant's current counsel of the diagnosis now given to defendant, her trial counsel testified that it "makes perfect sense in retrospect . . . ." This is a clear indication

that it was only the failure to recognize the diagnosis and possible defenses, not the unavailability of them, that caused these issues to not have been previously raised.

Defendant also failed to offer a valid reason explaining why the motion was filed almost ten years after her conviction and more than seven years after her unsuccessful appeal to the Michigan Supreme Court. Such long-delayed motions are looked on by the courts with disfavor, *People v Jackson*, 465 Mich 390, 398-399; 633 NW2d 825 (2001), a fact the trial court noted. Although defendant asserted that she was presenting newly discovered evidence, as detailed above, the evidence was not newly discovered. Rather, the only difference between the time of trial and the motion for relief from judgment was that defendant found expert witnesses who opined, *based upon the facts existing at the time of trial,* that she suffered from a mental disorder that existed at the time of trial, albeit under a different name. Thus, what this case presents is an argument that the *materiality* of the evidence is newly discovered, which has long been held to be an insufficient basis for the granting of a new trial. See *People v Clark*, 363 Mich 643, 647; 110 NW2d 638 (1961); *People v Stricklin*, 162 Mich App 623, 632; 413 NW2d 457 (1987).

I would therefore reverse the trial court's order on the basis that defendant failed to establish good cause for failing to raise this ground on appeal or in the prior motion.