*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 11, 2021

Plaintiff-Appellee,

v

No. 349169
Wayne Circuit Court
LC No. 04-012890-01-FC

THELONIOUS DESHANE-EAR SEARCY,

Defendant-Appellant.

Before: CAVANAGH, P.J., and SERVITTO and CAMERON, JJ.

PER CURIAM.

Defendant, Thelonious Deshane-Ear Searcy, appeals the trial court's order denying his motion for a new trial and successive motion for relief from judgment following an evidentiary hearing. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

On September 5, 2004, a shooting occurred at the corner of Conner Street and Whithorn Street near the Detroit City Airport. That night, an event known as a "Black Party" was taking place in that area. The area was crowded with traffic and pedestrians. At around 9:00 p.m., several eyewitnesses saw a man approach the back of a silver Corvette, which contained the murder victim and the assault victim, and begin shooting. A bullet struck the assault victim's hip, causing him injury, and the murder victim died from multiple gunshot wounds, including one to the back of the head and one to the chest. Although some of the eyewitnesses believed that the gunshots came from two separate guns, the eyewitnesses did not see a second shooter.

Police officers Micah Hull, Shawn Stallard, and Scott Herzog were in a semi-marked police car in the area of the shooting at around 9:00 p.m. Officer Hull heard the first volley of shots but could not see a shooter or the Corvette. Officer Hull attempted to pull forward, but the police car was hit by a burgundy Marauder. Officer Hull and Officer Stallard were then able to see a man with a handgun shooting a second volley of shots. However, the officers could not tell if the shots came from the same gun as the first volley. Officer Hull ran after the shooter, who ran east on Whithorn Street. The pursuit was unsuccessful, however, because the shooter got into a car that

-1-

sped away. The officers denied that they fired any shots and testified that they were only able to see the shooter's back. Casings from two different weapons were found at the scene, including seven .45-caliber casings and eight .40-caliber casings.

Three eyewitnesses identified Searcy as the shooter from a photographic lineup. On the morning of November 30, 2004, law enforcement went to an apartment in Clinton Township in an attempt to locate and arrest Searcy. Officers had to force entry into the apartment, where they initially only saw Searcy's grandmother and Searcy's wife. After searching the apartment, however, officers found Searcy hiding behind a piece of drywall in a bedroom closet, in a crawl space "behind and above a furnace." Force and pepper spray had to be used to remove Searcy from the crawl space. Officers also discovered a .45-caliber semi-automatic handgun on a dresser in the bedroom where Searcy was hiding. Ballistics testing revealed that the .45-caliber casings found at the scene of the shooting were fired from that gun.

Searcy was charged with first-degree premeditated murder, MCL 750.316(1)(a), assault with intent to murder, MCL 750.83, and possession of a firearm during the commission of a felony, MCL 750.227b. Trial was held over the course of several days in May 2005. The prosecution presented a myriad of witnesses, and four eyewitnesses identified Searcy as the shooter at trial. The prosecutor's theory at trial revolved around a claim that Searcy mistakenly shot the victims in an attempt to kill DeAnthony Witcher, who drove a Corvette that looked similar to the murder victim's Corvette. Witcher testified that Searcy had become upset with him after Searcy lost several hundred dollars while gambling at Witcher's home in the summer of 2003. According to Witcher, in November 2003, Searcy shot him in the hand and "through the back through the lung out [his] heart." Before Searcy shot Witcher, he stated "I got to kill you." After the November 2003 shooting, Searcy told Witcher that he was going to "get" or "kill" him. Although Witcher did not see or hear the shooting on September 5, 2004, he was in the area in the silver Corvette that he often drove.

Searcy did not testify at trial. Instead, he presented the testimony of several friends and family members, each of whom testified that Searcy was at a barbecue at the home of his mother throughout the evening of September 5, 2004. Additionally, Searcy's mother and grandmother testified that the apartment where Searcy was arrested belonged to his grandmother and that Searcy did not live there. Instead, they testified that Searcy and his wife and children had merely been visiting the apartment. Searcy's grandmother explained that the gun did not belong to Searcy and that it had been left in her apartment by a man named Jeffrey Daniels, who had driven her home one day and who was killed in September 2004.

The jury convicted Searcy as charged. He was sentenced to life in prison without parole for the first-degree murder conviction and to 15 to 30 years' imprisonment for the assault with intent to murder conviction, with the sentences to be served concurrently with each other and consecutively to a sentence of two years' imprisonment for the felony-firearm conviction. Searcy appealed, and this Court affirmed Searcy's convictions. People v Searcy, unpublished per curiam opinion of the Court of Appeals, issued October 26, 2006 (Docket No. 263347). Searcy filed an application for leave to appeal from this Court's decision, and our Supreme Court denied leave. People v Searcy, 477 Mich 1112; 729 NW2d 877 (2007). Thereafter, Searcy filed two motions for relief from judgment, each of which was denied by the trial court. Searcy was unsuccessful at obtaining appellate relief from the trial court's decisions.

In August 2015, Vincent Smothers, who was in prison and had already confessed to being paid to commit multiple murders in Detroit, wrote a letter to Searcy. In the letter, Smothers admitted that he had killed the murder victim "during a botched robbery on Whithorn and Conners [sic] across from the city airport." In December 2015, Smothers executed two affidavits, each of which detailed his involvement in the September 2004 crimes. Specifically, Smothers averred that he shot the murder victim with a .40-caliber handgun. Smothers also implicated Daniels in the crimes, indicating that Daniels had fired a .45-caliber handgun near the murder victim's Corvette.

After receiving one of Smothers's affidavits from the Michigan Innocence Clinic, Detective-Sergeant Christopher Corriveau interviewed Smothers. Detective-Sergeant Corriveau was familiar with Smothers because he had interviewed him previously in relation to Davontae Sanford, who was imprisoned in relation to several murders to which Smothers had confessed. During the interview, Smothers acknowledged that the affidavit was "incorrect" and that he had signed it at Searcy's "behest." Despite recanting to Detective-Sergeant Corriveau, Smothers participated in an interview with Scott Lewis, who is a licensed private investigator and a former journalist, on November 18, 2016. During the interview, Smothers told Lewis that he had killed the murder victim and explained the details of the crimes and Daniels's involvement. Smothers's statements to Lewis were largely consistent with the December 2015 affidavits, and Smothers executed another affidavit after his interview with Lewis.

In 2017, Searcy filed his third motion for relief from judgment under MCR 6.502(G)(2) and a motion for new trial under MCL 770.1, which is the subject of this appeal. The trial court appointed counsel for Searcy and scheduled an evidentiary hearing, which took place over the course of several days.

On the first day of the hearing, Smothers testified that he murdered the murder victim on Conner Street "[n]ear the Detroit City Airport" on what he believed was September 6, 2004. Smothers noted that, although he initially intended to rob the murder victim, he decided to kill him "[a]s [he] got up to the back of the car." Smothers testified in detail about the manner in which he and Daniels carried out the crimes and the manner in which they escaped from the scene. Smothers indicated that he decided to come forward when he learned that "somebody was locked up for" the September 2004 crimes. Smothers denied that he was promised anything in exchange for his testimony. Smothers also denied that he had "nothing to lose," noting that he could be paroled in his lifetime.[1]

During the testimony of Patricia Little, it was noted that an evidence envelope that contained a bullet that was removed from the murder victim's chest had conflicting descriptions. Although Little tried to provide an explanation concerning the conflicting labels, the trial court adjourned the hearing and ordered that the envelope be opened and examined to confirm the contents. After the envelope was opened and the contents were examined, the hearing resumed.

---

[1] Smothers testified that he had pleaded guilty to 11 counts of second-degree murder, as well as several counts of felony firearm. At the time of the hearing, Smothers was 37 years old and was serving "50 to 100 years and two years for felony firearm."

David Balash, who was qualified as a firearms expert at the hearing, testified that the envelope contained "a .40 S&W . . . fired bullet."

On December 3, 2018, the trial court issued an opinion and order, denying Searcy's third motion for relief from judgment and motion for a new trial. In relevant part, the trial court concluded that a reasonable jury could not credit Smothers's testimony that he committed the crimes. The trial court also rejected Searcy's reliance on the purported newly discovered forensic evidence. Although the trial court acknowledged that the bullet that was removed from the murder victim was at times mislabeled, the trial court found that it was clear that the envelope contained a .40-caliber bullet and that the police had simply made a labeling error. This appeal followed.

## II. STANDARDS OF REVIEW

A trial court's decision on a motion for relief from judgment is reviewed for an abuse of discretion, which exists when the court's "decision falls outside the range of reasonable and principled outcomes" or when the trial court makes an error of law. People v Swain, 288 Mich App 609, 628-629; 794 NW2d 92 (2010). "This Court reviews a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion." People v Johnson, 502 Mich 541, 564; 918 NW2d 676 (2018). Additionally,

> [a] trial court's factual findings are reviewed for clear error. Clear error occurs if the reviewing court is left with a definite and firm conviction that the trial court made a mistake. MCR 2.613(C) provides that regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it. And appellate courts need not refrain from scrutinizing a trial court's factual findings, nor may appellate courts tacitly endorse obvious errors under the guise of deference. [Id. at 565 (quotation marks and citations omitted; emphasis omitted).]

"The interpretation of a court rule is a question of law that is reviewed de novo." Swain, 288 Mich App at 629.

## III. ANALYSIS

### A. MOTION FOR A NEW TRIAL—MCL 770.1

Searcy argues that the trial court abused its discretion by denying his motion for a new trial under MCL 770.1. We disagree, however, because our Supreme Court "superseded MCL 770.1 with the adoption of MCR 6.431." People v Rogers, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 336000), slip op at 9. Because Searcy is not entitled to relief under MCL 770.1, the trial court did not abuse its discretion by denying Searcy's motion for a new trial. See id.

### B. MOTION FOR RELIEF FROM JUDGMENT

Next, Searcy argues that the trial court abused its discretion by denying his motion for relief from judgment. We agree in part.

Subchapter 6.500 of the Michigan Court Rules sets forth the procedure for post-appeal relief from a criminal conviction and provides the exclusive means for challenging a conviction once a defendant has exhausted the normal appellate process. People v McSwain, 259 Mich App 654, 678; 676 NW2d 236 (2003). Because Searcy's motion was a successive motion for post-judgment relief, Searcy was required to first meet a threshold requirement of presenting "new evidence that was not discovered before the first such motion." MCR 6.502(G)(2).

We conclude that the type of bullet that was removed from the murder victim's body did not constitute newly discovered forensic evidence. It is undisputed that the bullet that was removed from the murder victim's body had an evidence number of "E07191604." "ET # E 07191604" was labeled as a ".40 caliber, Metal jacket bullet" in People's Exhibit 23, which was admitted into evidence at trial. Kevin Reed, who worked for the firearms identification unit, testified at trial that the items listed in People's Exhibit 23 could not have been fired from the .45-caliber gun that was found in the room where Searcy was hiding at the time of his arrest because "they were not caliber consistent." Although what "ET # E 07191604" consisted of was not specifically identified by Reed at trial, Dr. Carl Schmidt testified that he removed four bullets from the murder victim's body so that they could be turned over to law enforcement. The bullet that was removed from the murder victim's chest was labeled as "E07191604" and was described by the morgue as a "bullet" from the murder victim's chest. However, it was also labeled by the police department as a nine-millimeter casing. These are entirely inconsistent descriptions.

Searcy filed his first motion for relief from judgment in March 2008. In July 2008, Searcy's attorney requested that the "firearm evidence be retested by the Michigan State Police to confirm or contradict the evidence that was presented at . . . trial." The firearm evidence was retested, and a report was completed by the Department of State Police Forensic Science Division. In relevant part, the report indicated that "E07191604" was tested and that it revealed a ".40 metal jacket bullet, 6R." Consequently, the bullet that was removed from the murder victim's body was not new at the time Searcy filed his first motion for relief from judgment. Indeed, the bullet was listed as a .40-caliber bullet on a trial exhibit. Although there were conflicting labels and the motion for relief from judgment had already been filed by the time Searcy sought retesting of the evidence, Searcy would have been able to move to amend or supplement the motion under MCR 6.502(F). Instead of doing so, Searcy decided not to pursue the issue once the evidence was retested and the report was received. In sum, because Searcy did not meet MCR 6.502(G)(2)'s requirements, the trial court was prohibited from granting Searcy's motion with respect to the bullet that was removed from the murder victim's body. Therefore, the trial court did not abuse its discretion in this respect. See Swain, 288 Mich App at 636.

Although it is undisputed that Searcy satisfied MCR 6.502(G)(2)'s threshold requirements with respect to Smothers's testimony, this was only the initial qualifying step for Searcy to receive a review of the merits of his motion for post-judgment relief. See id. at 635-636. In order to obtain relief, once that initial threshold for reviewing a successive motion was met, Searcy still needed to separately satisfy the requirements of MCR 6.508(D)(3), which "by its own language, applies to successive motions." See id. at 632.

"MCR 6.508(D)(3) provides that a court may not grant relief to a defendant if the motion alleges grounds for relief that could have been previously raised, unless the defendant demonstrates both good cause for failing to raise such grounds earlier as well as actual prejudice."

Johnson, 502 Mich at 565. " 'Cause' for excusing procedural default is established . . . by showing that some external factor prevented counsel from previously raising the issue." People v Reed, 449 Mich 375, 378; 535 NW2d 496 (1995). In this case, no evidence was introduced that Searcy was aware of Smothers's alleged involvement in the crimes until Smothers wrote Searcy a letter in August 2015. Indeed, the record is replete with evidence that, although Smothers knew of Searcy, Smothers and Searcy had never met in person. Additionally, although Marzell Black allegedly knew of Smothers's involvement as early as 2008 or 2009, there is no indication that Black told anyone about Smothers's involvement until early 2017, which was when he and Searcy became lodged in the same prison. Soon thereafter, Black executed affidavits, outlining what Smothers had allegedly divulged to him in 2008 or 2009. Given the record evidence, Searcy could not have raised his claims concerning Smothers at an earlier juncture. See Johnson, 502 Mich at 565.

Next, in order to obtain relief, Searcy had to establish "actual prejudice." MCR 6.508(D)(3)(b) defines "actual prejudice" as, in relevant part,

(i) in a conviction following a trial,

(A) but for the alleged error, the defendant would have had a reasonably likely chance of acquittal[.]

* * *

(iii) in any case, the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case[.]

This Court has held that the "actual prejudice" requirement for obtaining post-judgment relief "is similar to the prejudice standard in an ineffective assistance-of-counsel claim." Swain, 288 Mich App at 638. Stated simply, to obtain relief, Searcy did not need to demonstrate that no reasonable juror would have found him guilty. See id. at 638-639. Rather, he needed only to establish a reasonable probability that the result of his jury trial would have been different. See People v Carbin, 463 Mich 590, 600; 623 NW2d 884 (2001). This determination hinges not on "whether the defendant would have been more likely than not to have received a different verdict, but whether he received a fair trial in the absence of the evidence, i.e., a trial resulting in a verdict worthy of confidence." See People v Fink, 456 Mich 449, 454; 574 NW2d 28 (1998).

Our Supreme Court's recent decision in Johnson is dispositive. In that decision, our Supreme Court held that, "[i]n order to determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible." See Johnson, 502 Mich at 566-567 (emphasis added). The Johnson Court explained:

In making this assessment, the trial court should consider all relevant factors tending to either bolster or diminish the veracity of the witness's testimony. A trial court's function is limited when reviewing newly discovered evidence, as it is not the ultimate fact-finder; should a trial court grant a motion for relief from judgment, the case would be remanded for retrial, not dismissal. In other words, a trial court's

credibility determination is concerned with whether a reasonable juror could find the testimony credible on retrial . . . .

* * *

If a witness's lack of credibility is such that no reasonable juror would consciously entertain a reasonable belief in the witness's veracity, then the trial court should deny a defendant's motion for relief from judgment. However, if a witness is not patently incredible, a trial court's credibility determination must bear in mind what a reasonable juror might make of the testimony, and not what the trial court itself might decide, were it the ultimate fact-finder. [Id. at 567-568 (citations omitted).]

In this case, Smothers provided detailed testimony concerning the location of the crimes, the manner in which the crimes were carried out, and the weapons that were used. Smothers's testimony that he approached the Corvette from behind and then began shooting is consistent with eyewitness testimony. The physical evidence also supports Smothers's testimony that he moved toward the driver's side window, where he fired his gun once. Importantly, a bullet hole was located in "the side panel on the driver's side," and there were at least seven bullet holes in the Corvette. Furthermore, Dr. Schmidt testified at trial that there were gunshots to the back of the murder victim's body, including one gunshot to the back of the head, and that the trajectory of the other shots "went from left to the right."

Smothers also provided an explanation for the crimes: he wanted to rob the murder victim because he knew him to be a drug dealer who was making a large sum of money. Although the murder victim's wife testified that the murder victim was not a drug dealer in September 2004, evidence supported that the murder victim had been convicted of drug-related crimes in the past and had been sentenced to lengthy terms of imprisonment. Indeed, according to Smothers, the murder victim had several hundred dollars in his hand, and evidence at trial supports that $294 was found in the Corvette's center console.

While Detective-Sergeant Corriveau testified that Smothers was usually more calculated in carrying out his crimes, Smothers testified that he took more precautions with his "contract" cases. Smothers noted that the crimes that he perpetrated in September 2004 were not contract cases. Smothers's affidavits also support that he had been tracking the murder victim for months, which is consistent with Detective-Sergeant Corriveau's testimony about how Smothers carried out other murders. Moreover, Smothers's affidavits support that he carried out the crimes in the manner that he did, i.e., seemingly on a whim in a large group of people, because he had been unsuccessful in getting the murder victim alone and without his large "crew" during the months that he had been attempting to rob him.

Smothers also testified in detail about the "crash" that occurred between the vehicle that was being driven by police officers and a burgundy Marauder. Specifically, Smothers testified that the driver of the unmarked police vehicle did not get out of the vehicle and that it appeared that the airbag had deployed. Smothers further testified that the passenger was able to get out of the vehicle, at which time he began firing his gun at Daniels. Smothers's description was somewhat consistent with testimony at trial. Specifically, one of the eyewitnesses testified that a

Marauder got into an accident with another vehicle a short period of time after the shooting. Officer Hull testified that he was driving a semi-marked police car that collided with a Marauder a short period of time after the shooting. Although Officer Hull agreed that the airbags of the police car deployed, Officer Hull testified that he got out of the car and pursued the shooter on foot. The officers who were at the scene immediately after the shooting denied firing their weapons. Although Smothers's testimony is not entirely consistent with the testimony offered at trial, there were similarities and perhaps most importantly, Officer Hull's testimony is consistent with Smothers's testimony that Daniels was able to escape by getting into the car that Smothers was driving.

Furthermore, Smothers described Daniels's alleged involvement in the crimes in detail. Importantly, Smothers indicated that Daniels was using a .45-caliber handgun. While Smothers believed that Daniels only shot into the air, Smothers testified that he was not surprised that multiple .45-caliber casings were found at the scene. Smothers's description of Daniels at the evidentiary hearing is also somewhat consistent with an eyewitness's testimony, who described the shooter as being about six feet tall and weighing "maybe 150 pounds." According to Smothers, Daniels looked similar to Searcy, and testimony at trial supported that Searcy was about six feet tall and that he weighed between 140 and 145 pounds.

Additionally, Smothers testified at the hearing that the .40-caliber and .45-caliber handguns belonged to him and that he gave them to Daniels and told him to get rid of them. Although the trial court found it unbelievable that Smothers "would turn over his weapons to someone who mysteriously turn[ed] up dead weeks after the homicide," Smothers testified that Daniels was his "associate[]" and that he had known Daniels for "several years." Smothers also testified that he often gave murder weapons to others to keep because Smothers lived in "the suburbs." Importantly, Searcy's grandmother testified at trial that the .45-caliber gun that was associated with some of the casings found at the crime scene was brought into her apartment by Daniels. Testimony at trial supported that Daniels was killed a short period of time after the crimes were committed, and this is consistent with Smothers's testimony concerning Daniels.

Smothers's testimony was also supported by Black, who testified that Smothers disclosed to him in 2008 or 2009 that he had committed the crimes to which Searcy had been convicted. Although the trial court concluded that it is unlikely that Smothers would have made such a disclosure to Black given that Black had implicated Smothers in a different murder, the record does not support that Black and/or Smothers had any sort of vendetta against one another. Rather, they had been friends for many years, and Black testified that he did not really think much of Smothers's disclosure at the time it was made. Rather, Black was more concerned about the criminal charge(s) that he was facing.[2] Indeed, the record supports that it was not until Black executed affidavits in March 2017 that he publicly disclosed Smothers's alleged involvement. Black's affidavits were executed more than one year after Smothers wrote letters and executed two affidavits, which outlined his involvement in the crimes.

---

[2] Black and Smothers were facing criminal charges in relation to the murder of a Detroit woman, whose husband had allegedly contracted with Black and Smothers for her murder.

-8-

To support that Smothers's testimony was incredible, the trial court also relied on the fact that Smothers had recanted one of his affidavits when he was interviewed by law enforcement and that Detective-Sergeant Corriveau believed that Smothers had been threatened. However, Detective-Sergeant Corriveau was only under the impression that Smothers had been threatened. Detective-Sergeant Corriveau testified that the way that he "recall[ed] the conversation was that [Smothers] indicated that Mr. Searcy told him that he had friends on the outside, and they had seen his wife and children playing, and he kind of—and we asked him if he felt threatened." According to Detective-Sergeant Corriveau, Smothers "kind of said yes, something to that effect." The interview was not recorded and Detective-Sergeant Corriveau did not take notes, so it is impossible to know exactly what Smothers said during the interview. Furthermore, Smothers was able to explain why he had recanted the affidavit: he did not want Sanford's release from prison to be "held up" by another investigation being opened. According to Smothers, "investigators" had told him that Sanford "wouldn't be able to get out" of prison if a new investigation was opened.

While Detective-Sergeant Corriveau denied that Smothers was told that Sanford's investigation would be delayed if Smothers did not recant, we find it notable that, although Smothers initially agreed to execute an affidavit that recanted his confession, Smothers never did so. Rather, Smothers continued to assert that he and Daniels were involved in the crimes in question. Smothers went so far as to testify about his involvement at an evidentiary hearing against the advice of his counsel. Furthermore, although Detective-Sergeant Corriveau did not believe that the affidavit that he received from the Michigan Innocence Clinic was consistent with the manner in which Smothers spoke or wrote, Smothers testified that he did not draft the December 10, 2015 affidavit. Rather, Smothers indicated that another inmate, whose name Smothers could not recall, wrote it for him. Smothers confirmed under oath that he had signed all of the affidavits and that the affidavits were factually accurate. Thus, although the fact that Smothers recanted during his interview with law enforcement and Detective-Sergeant Corriveau's testimony certainly damages Smothers's credibility, we conclude that a reasonable juror could nonetheless find that Smothers was telling the truth about his involvement in the crimes.

The trial court acknowledged that Smothers knew details about the shooting, but concluded that this was explained by the fact that Smothers and Searcy had been lodged in the same prison for a period of time and that Searcy had trial materials in his possession. After reviewing motions for relief from judgment that Searcy obviously drafted himself, it is clear that Searcy had trial transcripts and other trial materials in his possession. Smothers was also able to get a letter to Searcy in August 2015. However, as noted by Searcy, the prosecutor never presented this theory or any evidence to support the trial court's finding that Searcy and Smothers had shared information while they were at the same prison. Consequently, because the trial court's factual finding that Smothers and Searcy were able to share records was not rooted in anything in the record, the trial court clearly erred in this respect.

As our Supreme Court made clear in Johnson, "a trial court's credibility determination is concerned with whether a reasonable juror could find the testimony credible on retrial." Johnson, 502 Mich at 567. We conclude that, when considering Smothers's testimony in its entirety, it is clear that his testimony is not wholly incredible, as the trial court found, and that a reasonable juror could find his testimony worthy of belief on retrial. Consequently, the trial court clearly erred when it concluded that Smother's testimony was entirely incredible. See id. at 571.

The next step is to consider "what a reasonable juror might make of the testimony" at a future retrial. See id. at 568. In doing so, this Court "must consider the evidence that was previously introduced at trial" and "the evidence that would be admitted at retrial," which in this case includes Smothers's admissions and the information concerning the type of bullet that was removed from the murder victim's body.[3] Id. at 571. The Johnson Court noted that, when "the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." Id. at 576 n 16 (quotation marks and citation omitted).

Smothers testified that he intended to rob the murder victim because he believed that he was making a substantial sum of money selling drugs. However, according to Smothers, he decided to murder the murder victim once he and Daniels approached the back of the Corvette. Smothers then testified in detail about what occurred after the shooting, including how he and Daniels had escaped and the involvement of the police. Some of this testimony is supported by trial testimony. Additionally, the manner in which Smothers reported approaching the Corvette and shooting the murder victim is consistent with evidence presented at trial. Although none of the eyewitnesses saw two shooters, witnesses provided different physical descriptions of the shooter, and .40 and .45-caliber casings were recovered from the scene. Importantly, at trial, the prosecutor proceeded under the theory that there were two shooters.

Although a .45-caliber gun was located in the area where Searcy was hiding when he was arrested and the gun was found to be the gun that fired the .45-caliber casings that were found at the scene, only the .45-caliber gun could be tied to Searcy at trial because the .40-caliber gun was never recovered. The jury began deliberating on Friday, May 6, 2005 at 12:22 p.m. The jury asked whether the casings were "45 cal or 40 cal." The jury also asked "what type of caliber of bullet was found in the deceased." In the same note, the jury asked to review "the video";[4] Officer Velma Tutt's report, which described the location and type of casings that were recovered at the scene; and the medical examiner's report. At 2:30 p.m., the jury was brought into the court room, and the trial court indicated that the jury was given the medical examiner's report and the portion of Officer Tutt's report that was admitted into evidence. The trial court then stated as follows:

> Now with regard to your first question, what type of caliber bullet was found in the deceased?

---

[3] Searcy argues that this Court should also consider an October 2004 memorandum and evidence of Witcher's November 2004 arrest. Because Searcy fails to explain or rationalize in a detailed manner how such evidence would be admissible, we decline to consider it. In declining to do so, however, we express no opinion as to whether the evidence should be admitted at retrial.

[4] At trial, the prosecutor presented a ten-seconds-long video recording from the camera that was mounted on the front of the semi-marked police car. The prosecutor claimed that the recording showed that the crowd scattered and that a man who could be the first shooter could been seen running before a second man appeared to fire. It does not appear from the transcript that either man was particularly identifiable from the recording.

After speaking with the attorneys they have agreed to my sharing with you the fact that the testimony presented in the case, and there is a report on one of the Exhibits that the bullets that were recovered from the deceased were too deformed to be able to identify what gun it came from or what caliber it came from.

The trial court then provided the jury with different options for watching the video and noted that the members of the jury could review the video as many times as they deemed necessary. At some point, the jury was sent home for the weekend.

The jury resumed deliberations on Monday, May 9, 2005. At some point, the jury indicated that they "would like to identify the spent casings[.]" In the same note, the jury also asked to review Officer Tutt's testimony. At 9:48 a.m., the jury was brought back into the court room, and Officer Tutt's testimony was read back to the jury. The jury resumed deliberations at 10:32 a.m. Thereafter, the jurors asked to "see the spent casings" and asked "what type of gun was recovered." At 12:10 p.m., the jury was brought back into the court room. The trial court indicated that "the gun that is in evidence is a .45 caliber semiautomatic handgun." The trial court further indicated as follows:

> Now your second request that you asked was if I understood [it] correctly, is that you wanted to see the actual shell casings that were marked A through O.

> Let me explain to you that with regards to the shell casings, A through O, for purposes of the trial the firearm's examiner who testified, testified with regards to, you know, examining a number of them and testified and actually examined here two of them. That was Item A and Item B, which were both .45 caliber spent casings.[5]

> So only two of the actual shell casings were physically introduced into evidence, both of them being .45 caliber shell casings. And we'll arrange to send those two into the jury room for you to examine.

> \* \* \*

> Testimony was that with regards to shell casing, A and B, which are both .45 caliber casings, the testimony from the firearm's examiner was that those two casings were fired from the same weapon. Okay.

> However, the shell casings, the actual casing itself in A and the casing in B came from, the actual casings from the bullets came from different companies. Okay. The ammunition supplier was different, but the testimony was that they came from the same gun.

---

[5] Only two .45-caliber casings were tested because it was determined that all of the .45-caliber casings "came from the same gun."

The trial court noted that the remaining shell casings were "covered in the report, the actual written report of the firearm's examiner." The trial court also noted that the report "kind of breaks them down in terms of certain caliber casings," i.e., .40 caliber and .45 caliber. However, the trial court noted that the casings were not referenced in the firearm examiner's report like they were in Officer Tutt's report, which referenced the casings based on a letter A through O. The trial court indicated that, if the jury wanted the firearm examiner's report, the foreperson should send a note. The jury resumed deliberating at 12:18 p.m.

Later, the jury asked to see "the firearm expert report." The jury indicated that they wanted to "compare [the] report with the other." For purposes of the record, the jury returned to the court room at 2:05 p.m. The trial court explained as follows:

> With regards to your request, what we have done is with regard to the shell casings that were marked A through O, we have marked them on what is People's Exhibit Number 18, and People's Exhibit Number 21 in red ink is the letter that corresponds with Evidence Technician Tutt's evidence lettering regarding the casings that she found, and it will match up then with the evidence tag number, as well as whether or not it's a .40 caliber or whether or not it's a .45 caliber.

The jury was excused from the court room at 2:07 p.m. At 2:35 p.m., the jury found Searcy guilty as charged.

Thus, the jury had some difficulty with reaching a verdict and, at one point, indicated that they were unable to reach a unanimous verdict.[6] The jury was very interested in information concerning the casings, the type of gun that was recovered, and the type of bullet that was found in the murder victim. Importantly, the jury was informed that "the gun that is in evidence is a .45 caliber semiautomatic handgun" and was then informed that the bullet that was removed from the murder victim could not be tested because it was "too deformed." However, as already discussed, the type of bullet was able to be discerned and had been accurately described as a .40-caliber bullet before trial. Without this important evidence, the jury was left to decide whether, based on the location of the .45-caliber casings and other record evidence, Searcy committed the crimes.

Although four eyewitnesses identified Searcy as the shooter at trial and three eyewitnesses had identified Searcy in a photographic lineup, some of the eyewitnesses gave different physical descriptions of the shooter. Additionally, one of the eyewitnesses acknowledged that he could not identify the shooter "by face." The prosecutor was also unable to provide a motive as to why Searcy would want to murder the murder victim, instead relying on a theory that Searcy actually intended to murder Witcher. While the prosecutor correctly notes on appeal that Searcy was found hiding in a room where the .45-caliber gun was located and that the gun was associated with casings at the scene, Searcy's grandmother provided an explanation as to why the gun was in that location. Specifically, she testified that Daniels had brought the gun into her apartment in August 2004. While this explanation is problematic given that the crimes were committed in September 2004, there could be other reasons why Searcy was hiding from the police, some of which could be somewhat innocent or simply unrelated to the crimes at issue in this case. Importantly, it is

---

[6] This note was not addressed on the record. It appears that it was written on May 6, 2005.

ultimately for the jury to determine whether a defendant's conduct was indicative of consciousness of guilt. See People v Sholl, 453 Mich 730, 740; 556 NW2d 851 (1996).

Although the jury disregarded the many witnesses who provided alibi testimony on behalf of Searcy at trial, if the jury was aware that the bullet that was found in the murder victim was from a .40-caliber gun and that Smothers was taking responsibility for the crimes, they may have put more stock in Searcy's alibi defense. As already stated, when "the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." Johnson, 502 Mich at 576 n 16 (quotation marks and citation omitted). In sum, when considering the trial evidence in light of the other evidence that would be presented at retrial, we conclude that Searcy has a reasonably likely chance of acquittal. See MCR 6.508(D)(3)(b)(i)(A). Therefore, the trial court abused its discretion by denying Searcy's motion for relief from judgment with respect to Searcy's claim of new evidence relating to Smothers.[7]

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto
/s/ Thomas C. Cameron

---

[7] To the extent that Searcy argues that the trial court abused its discretion by denying his motion for relief from judgment in relation to his claims concerning Witcher's November 2004 arrest, we conclude that Searcy is not entitled to relief. Searcy already raised this argument in his second motion for relief from judgment, which was denied by the trial court. This Court dismissed Searcy's application for leave to appeal, *People v Searcy*, unpublished order of the Court of Appeals, entered December 29, 2015 (Docket No. 330257), and our Supreme Court denied leave because Searcy "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," *People v Searcy*, 500 Mich 880; 886 NW2d 436 (2016). See MCR 6.508(D)(2) ("The court may not grant relief to the defendant if the motion . . . alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter[.]").