*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SEE VENTURE FUND, LLC, THEODORE BASH, and PATTI ANN BASH,

        Plaintiffs-Appellants,

v

MERCANTILE BANK CORPORATION,

        Defendant-Appellee.

UNPUBLISHED
August 15, 2024

No. 363166
Saginaw Circuit Court
LC No. 20-041433-CB

Before: REDFORD, P.J., and GADOLA, C.J., and RIORDAN, J.

PER CURIAM.

Plaintiffs, See Venture Fund, LLC (SVF), Theodore Bash (TB), and Patti Ann Bash (PB), appeal as of right a judgment of no cause of action entered after a bench trial. The trial court ruled in favor of defendant, Mercantile Bank Corporation (the bank). Plaintiffs also appeal an earlier ruling by the court granting summary disposition in favor of the bank under MCR 2.116(C)(10) on a breach-of-bailment claim, which was one of four causes of action alleged by plaintiffs. We affirm.

TB is a physician and attempted to start a medical business with a man named Andy Park. TB formed SVF for this purpose and was its sole member. And Park was the business manager. SVF obtained two loan products from the bank: (1) a term loan for $120,000 (at times referred to as the "610 account"); and (2) a line of credit (LOC) for $130,000 (at times referred to as the "602 account"). In order to secure the funding, TB and his wife, PB, granted the bank a future advance mortgage on their vacation home in Traverse City. Eventually, both loans went into default, and the bank commenced foreclosure proceedings on the Traverse City property. TB and PB, without admitting liability and expressly denying an accord and satisfaction, paid $248,769.78 to the bank to stop the foreclosure proceedings.

Plaintiffs asserted that Park committed fraud and stole the loan monies. They contended that the bank was civilly liable for allowing funds from the 602 and 610 accounts to be deposited into checking accounts at the bank. It was from these checking accounts that Park allegedly stole the money. Plaintiffs maintained that they never authorized any disbursements of the loan funds

into the checking accounts. The bank contended that at all times it had observed best practices for secure banking and that the disbursements occurred at TB's direction or the direction of someone to whom TB had granted banking access. In essence, the bank asserted that plaintiffs were targeting the wrong person or entity and that it was Park, not the bank, who had harmed plaintiffs. The trial court ultimately agreed with the bank following a bench trial. On appeal, plaintiffs argue that the trial court clearly erred by finding that TB had allowed for the transfer of funds into the checking accounts. Plaintiffs also take issue with the court's dismissal, by way of a pretrial ruling on a motion for summary disposition, of plaintiffs' breach-of-bailment claim.[1]

In a civil bench trial, the court must make factual findings in relation to whether the plaintiff proved the elements of his or her civil action, including damages, by a preponderance of the evidence. See *Jackson v Bulk AG Innovations, LLC*, 342 Mich App 19, 20; 993 NW2d 11 (2022). " 'This Court reviews a trial court's findings of fact following a bench trial for clear error and reviews de novo the trial court's conclusions of law.' " *Knight Enterprises, Inc v RPF Oil Co*, 299 Mich App 275, 279; 829 NW2d 345 (2013), quoting *Redmond v Van Buren Co*, 293 Mich App 344, 352; 819 NW2d 912 (2011). "A finding is clearly erroneous if there is no evidentiary support for it or if this Court is left with a definite and firm conviction that a mistake has been made." *Chelsea Investment Group, LLC v City of Chelsea*, 288 Mich App 239, 251; 792 NW2d 781 (2010) (citations omitted). "De novo review means that we review the legal issue independently, without required deference to the courts below." *Wright v Genesee Co*, 504 Mich 410, 417; 934 NW2d 805 (2019). "This Court is especially deferential to the trial court's superior ability to judge . . . the relative credibility of witnesses." *Smith v Straughn*, 331 Mich App 209, 215; 952 NW2d 521 (2020) (quotation marks, citation, and brackets omitted).[2] "[W]e must scrutinize the trial court's factual findings and, while according those findings deference as required by the court rule, we are not to tacitly endorse obvious errors, or omissions, under the guise of that deference." *People v McSwain*, 259 Mich App 654, 683; 676 NW2d 236 (2003).

We review de novo a trial court's ruling on a motion for summary disposition. *Champine v Dep't of Treasury*, 509 Mich 447, 452; 983 NW2d 741 (2022).[3]

---

[1] The bench trial concerned plaintiffs' three remaining claims, which consisted of (1) an alleged breach of the debtor-creditor relationship between SVF and the bank, (2) an alleged breach of the future advance mortgage between TB/PB and the bank, and (3) the alleged unjust enrichment by the bank in connection with its collection of $248,769.78 from TB and PB.

[2] "Findings of fact by the trial court may not be set aside unless clearly erroneous. In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C).

[3] In *Anderson v Transdev Servs, Inc*, 341 Mich App 501, 506-507; 991 NW2d 230 (2022), this Court recited the principles that govern the analysis of a motion brought pursuant to MCR 2.116(C)(10):

MCR 2.116(C)(10) provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material

Plaintiffs contend that the trial court's factual findings were clearly erroneous and that it was lax security measures at the bank, as opposed to any actions by TB, that resulted in a transfer of funds from the 602 and 610 accounts into the checking accounts.[4] Plaintiffs argue that TB's testimony that he never accessed the online-banking portal or gave anyone else permission to do so, along with log information showing that online access was associated with an IP (internet protocol) address distant from West Branch, where TB lives, and an internet provider, Comcast, that TB does not use, establishes that the trial court clearly erred by concluding that it was TB's own actions that led to the disbursement of loan funds into the checking accounts.

The loan officer, Alan Bruder, testified that he, TB, and Park were together right after the execution of the term-loan documents, that TB stated that "they wanted to get going with things" and "would need the money," and that TB requested disbursement of the term-loan funds into two checking accounts. Bruder explained that $70,000 was to go to SVF and $50,000 to a second TB-owned company. Bruder asserted that TB signed the disbursement authorization in his presence.

---

fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a party's action. "Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required . . . when judgment is sought based on subrule (C)(10)," MCR 2.116(G)(3)(b), and such evidence, along with the pleadings, must be considered by the court when ruling on the (C)(10) motion, MCR 2.116(G)(5). "When a motion under subrule (C)(10) is made and supported . . ., an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4).

A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party. Speculation is insufficient to create an issue of fact. A court may only consider substantively admissible evidence actually proffered by the parties when ruling on the motion. [Quotation marks, citations, and brackets omitted.]

[4] Plaintiffs' attorney repeatedly insisted at trial that the basis of the complaint was not the *departure of the money from* the checking accounts but *the transfer of the money to* the checking accounts in the first instance.

A statement for the SVF checking account, dated February 29, 2016, was sent to TB's home address, and it showed the $70,000 deposit. A February 29, 2016 statement for the second company that was also mailed to TB's home address reflected the $50,000 deposit.

The upshot of this evidence is that plaintiffs' argument related to online banking is not even pertinent to the disbursement of the term-loan monies because Bruder's testimony indicated that the disbursement took place in accordance with in-person directions from TB. The trial court did not make a separate factual finding regarding disbursement of the term-loan funds as opposed to the LOC funds, but plaintiffs do not raise this as an issue on appeal. Moreover, the court did make this general statement:

> In any event after reviewing all of the evidence the [c]ourt is not persuaded that the bank breached its debtor/creditor relationship with See Venture or breached its obligations under the Bashes['] future advance[] mortgage, or has been unjustly enriched. Accordingly the [c]ourt will grant a judgment of no cause of action.

The court's conclusion in this regard with respect to the term loan is amply supported by Bruder's testimony.

Money from the LOC, however, was disbursed into checking accounts by way of online banking. And it is true that TB testified that he did not access the bank's online system or authorize anyone else to do so. But there was ample evidence in the record to support the trial court's finding that TB must have, at a minimum, allowed third-party access.

Bruder testified that during a meeting with TB and Park, it was agreed that TB would be the "company system administrator" (CSA) for purposes of online banking associated with the two loan products. The CSA is the person "in charge of all the online banking." Bruder explained that an e-mail address was needed to set a person up as a CSA, and he was directed to use <apark@wellteckusa.com>. Bruder testified that TB was present at the time and that he raised no objections or concerns regarding the use of that e-mail address. Indeed, Bruder stated that TB signed the online-banking form with that e-mail address in Bruder's presence. The form indicated that "the account owner understands the importance of maintaining password confidentiality and will not disclose log-in and password information to others." The form further provided that the account owner "understands the importance of regularly reviewing account statements for irregularities."

John Schulte, a supervisor in online banking for the bank, explained that the bank uses an outside vender, Q2 E-Banking (Q2), to implement its online-banking procedures and that this vendor is used by "40 of the top 100 banks" in the country. Schulte contended that Q2 uses a "layered" and "multifactor" approach to security. He stated that once a CSA is identified in a written form, a bank employee sets up an account and sends a letter to the CSA with instructions on how to enroll in online banking. The letter itself does not provide sufficient information for a person to enroll; instead, one must have a six-digit security code that is sent by way of a text message or connected voice call (not a voicemail) to the cellular telephone number that was provided to the bank. In other words, a person who simply intercepted the letter would not be able to obtain online-banking access. The code is valid for 15 minutes, and the CSA must then create a password.

TB's online-banking form listed his home address and a "login ID" of "TABash." Schulte testified that according to a log of records, user TABash logged in for the first time on March 2, 2016. The log listed TB's cellphone number as the number used during the process. It also indicated that a voice call was employed to obtain the security code. Schulte expressed that the log revealed that the TABash user transferred various monies from the LOC into internal checking accounts starting on May 9, 2016. TB testified that he had had the same cellphone number throughout the proceedings and had not lost his cellphone. He further testified that he did not think he had given his telephone to "somebody else to use for a period of time."

This evidence adequately demonstrated that the bank utilized proper security measures, and it sufficiently supported the trial court's finding that TB, as the CSA, must have given Park access to the online-banking portal.[5] The trial court's conclusion is further supported by the fact that TB himself stated that he willingly went into business with Park and *only later* discovered that Park was not trustworthy. Plaintiffs mention the log of online activities that showed an IP address other than in West Branch and an ISP (internet service provider) other than the ISP used by TB. But Schulte testified that the IP addresses listed on the log were an "approximation" and that sometimes his own telephone showed his IP address as being in Warren even though he lives in Grand Rapids. Schulte also explained that if one is using Wi-Fi on a telephone, the IP address

---

[5] The trial court stated:

> Without detailing every piece of the expansive evidence that covered many months of transactional history, for me, the case ultimately comes down to one event, one point in time.
>
> Dr. Bash claims he never enrolled and activated an online account for See Venture, much less processed or authorized electronic withdraws or transfers. But somehow it seems that Andy Park did gain access and drained away loan proceeds.
>
> The [c]ourt concludes that online banking that Dr. Bash claims to eschew was activated when he logged-on to the bank's website, entered a temporary ID, and completed the enrollment process and activation.
>
> Importantly, the way the bank's online enrollment process is structured, the enrollment and activation process could be accomplished only through Dr. Bash's personal cell phone. A cell phone that Dr. Bash and no one else possessed. The implications are obvious.
>
> True, Andy Park may well have ultimately walked away with loan proceeds. But Park's access[] to See Venture's online banking account could have only come through Dr. Bash who singularly had the ability to originate and secrete or share the account and password. Although[] Dr. Bash may have no memory of it, the court concludes he must have shared the online banking account info with others, presumably Andy Park in particular, and in that way did authorize the subsequent transactions.

-5-

would show the ISP associated with the Wi-Fi and not necessarily the ISP used by the phone's owner at home. He observed that the IP addresses on the log were not a reliable indication of the physical location of the device or the customer. Schulte testified that for someone other than the CSA to obtain online-banking access, that person would need authorization from the CSA.

Under all these circumstances, and keeping in mind that the trial court was in the best position to assess the credibility of the witnesses, *Ambs v Kalamazoo Co Rd Comm*, 255 Mich App 637, 652; 662 NW2d 424 (2003), we conclude that no basis for reversal is apparent in relation to the trial court's findings after the bench trial.[6]

Plaintiffs also argue that the trial court improperly dismissed their breach-of-bailment claim before trial when it granted the bank's motion for summary disposition under MCR 2.116(C)(10). The trial court stated the following after the bench trial:

> For what it's worth, although the [court] previously dismissed a bailment claim by See Venture[,] [e]ven if that claim had somehow survived the outcome would not be different. Assuming for the moment that the relationship could be characterized as a bailment, given Dr. Bash's misstep and effectively authorizing others to withdraw loan proceeds, the trial evidence did not demonstrate a breach of bailee's duties.

Our affirmance of the trial court's findings after the bench trial renders moot an analysis of the breach-of-bailment claim because there was no error by the court in finding that the bank did nothing improper and that it was TB's owns actions that led to disbursements to the checking accounts. We will nevertheless provide a brief analysis.

Plaintiffs' theory was that SVF was the bailor with regard to the loan products and that the bank, as bailee, breached its duties to safeguard the monies. In *Goldman v Phantom Freight, Inc*, 162 Mich App 472, 479-480; 413 NW2d 433 (1987), the Court stated:

> "Bailment," in its ordinary legal signification, imports the delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished. Phrased another way, it is a relationship wherein a person gives to another the temporary use and possession of property *other than money*, the latter agreeing to return the property to the former at a later time. [Citations omitted; emphasis added.]

---

[6] The bank sets forth many proposed alternative bases for affirmance. But they need not be relied upon in light of the clear infirmity of plaintiffs' appellate arguments. We find it more prudent to rely on the conclusions reached by the trial court as opposed to theories on which the court did not rule. That said, we find the alternative bases or theories fairly persuasive but ultimately make no ruling on those theories.

-6-

In *Godfrey v Flint*, 284 Mich 291, 295-296; 279 NW 516 (1938), the Michigan Supreme Court also noted that the law of bailments pertains to property other than money. See also *In re George L Nadell & Co*, 294 Mich 150, 154; 292 NW 684 (1940) (discussing bailments of personal property). Plaintiffs have simply not provided any Michigan authority for the proposition that loan monies could potentially be the subject of a bailment and instead rely on out-of-jurisdiction caselaw.

But even the caselaw plaintiffs provide is not persuasive to prove their assertion that a bailment existed. For example, in *In re LGI Energy Solutions, Inc*, 460 BR 720, 729 (Bankr CA 8, 2011), the court stated:

> Although bailment is most typically thought of in the context of personal property or chattels—such as a car, for example—the concept has been held to include other types of property, including money . . . . By its nature, the analysis of bailment of money is more complicated than that involving a car, for example. Either way, however, one of the core principles of a bailment is that the bailee holds specific and identifiable property for the bailor. If either by contract or otherwise, there is no obligation to restore the specific property, and the bailee is at liberty to return another thing of equal value or the money value the transaction is not a bailment. [Quotation marks, brackets, and citation omitted.]

The *In re LGI* court set forth the following passage from a treatise:

> While the parties to a bailment of money have the right and authority to change their relation, by a later contract, to that of debtor and creditor as parties to a loan, a bailment of money is not converted into a loan by reason of the mere fact that the bailee is not able to return the identical currency or specie deposited with him or her. Whether one who transfers money to another[7] should be considered a bailor or a creditor turns on the intent of the parties to the transaction, as manifested by their conduct and statements and any other relevant evidence. *A bailment of money is created when a special or specific bank account is created, title to the funds remains with the account holder, and the funds are separated from other deposits.* [*Id*. (citations omitted; emphasis added by *In re LGI*).]

As aptly noted by the trial court in the case at bar:

> Here, the parties' agreement, documented in several writings, makes no mention of See Venture depositing any specific money or property with the Bank, or of a duty to segregate or return anything in-kind. And See Venture has identified no evidence supporting the proposition that its accounts with the Bank were other than ordinary. And an ordinary, general account is not a bailment.

---

[7] Plaintiffs' theory here is that they "transferred" the loan-product monies to the bank, for the bank to hold as a bailee.

Plaintiffs emphasize that an ordinary *checking* account was not at issue,[8] but that is not dispositive. The operative fact is that plaintiffs did not demonstrate that they gave the money in the 602 and 610 accounts to the bank as part of a special, segregated deposit. We thus conclude that the trial court's determination that there was no bailment as a matter of law did not constitute error.

       Affirmed. Having fully prevailed on appeal, the bank may tax costs under MCR 7.219.

/s/ James Robert Redford
/s/ Michael F. Gadola
/s/ Michael J. Riordan

---

[8] In *Riverview Coop, Inc v First Nat Bank & Trust Co of Mich*, 417 Mich 307, 317-318; 337 NW2d 225 (1983), the Court stated:

> When funds are deposited in an ordinary checking account, they become the bank's funds for such use as the bank deems appropriate, subject only to the bank's duty to repay to the creditor-depositor an amount equal to the sums deposited upon the call of the depositor or his authorized representative. The money, once deposited, becomes the bank's money, the depositor having only an entitlement to recoupment of an equivalent sum upon demand, having loaned the bank the amount deposited. Such funds become a fungible part of the bank's general assets and retain no separate identity.