*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MICHAEL BRIAN MCJUNKIN,

Defendant-Appellant.

UNPUBLISHED
October 14, 2024
3:03 PM

No. 364689
Calhoun Circuit Court
LC No. 2016-001379-FH

Before: MARKEY, P.J., and BORRELLO and GARRETT, JJ.

PER CURIAM.

In 2015, police officers arrested defendant, Michael Brian McJunkin, after responding to reported suspicious activity at a house in Battle Creek. When the police arrived, they noticed the smell of ammonia permeating from a detached garage and suspected methamphetamine (meth) manufacturing. The officers later discovered an active "one-pot" meth laboratory and coffee filters containing ground up pseudoephedrine, a primary component in meth manufacturing. A jury convicted McJunkin of providing chemicals or laboratory equipment to another person for the manufacturing of controlled substances, MCL 333.7401c(1)(c); MCL 333.7401c(2)(f). In a previous appeal, this Court affirmed McJunkin's challenge to the police's seizure of the coffee filters. *People v McJunkin (McJunkin I)*, unpublished per curiam opinion of the Court of Appeals, issued August 28, 2018 (Docket No. 338400), pp 1-2. The Michigan Supreme Court remanded the case to the trial court for an evidentiary hearing on the police's search and seizure, see *People v McJunkin (McJunkin II)*, 505 Mich 883, 883 (2019), and the trial court found no violation of McJunkin's Fourth Amendment rights. McJunkin appeals as of right once more. Because we hold that the officers lacked consent to search and did not lawfully seize the coffee filters, we reverse.

## I. BACKGROUND

In *McJunkin I*, unpub op at 1-2, we summarized the facts of this case as follows:

On the evening of August 14, 2015, police officers Zachary Burgess, Michael Ziegler, and Brandon Huggett responded to a report of suspicious activity at a home that was later determined to be the residence of Craig Wightman. According to Wightman's neighbor, a green Ford Explorer had pulled into Wightman's detached

-1-

garage, drapes were drawn over the garage windows, and an odd smell became apparent shortly thereafter. While approaching the garage on foot, the officers detected a strong odor of ammonia, which indicated to the officers that there may have been an active, one-pot [meth] laboratory within the garage.

When the officers were about 10 feet away from the garage, Wightman left the garage through a side door, leaving that door open behind him. The officers detained Wightman and looked through the door, spotting two people: Justin McCowen—who was standing in front of a dryer—and McJunkin—who was sitting in the driver's seat of the Explorer with the driver's door open. Both McCowen and McJunkin were ordered out of the garage and detained. Wightman gave Officer Huggett consent to search the garage.

During his search of the garage, Officer Burgess came across a one-pot [meth] laboratory inside of a water bottle, located on top of the dryer, and a backpack containing the materials necessary for manufacturing [meth]. Within the Explorer, Officer Burgess found McJunkin's identification card on the driver's seat, and, in the driver-side cup holder, he discovered several folded coffee filters that contained crushed pseudoephedrine tablets—a primary component in the manufacturing of [meth].

Wightman testified as a witness for the prosecution. Although two defense witnesses testified that Wightman had assured them before the trial that McJunkin had nothing to do with the [meth] activity, Wightman testified differently. According to Wightman, he, McCowen, and McJunkin met on August 14, 2015, and hatched a plan to manufacture [meth]. The three agreed that Wightman and McCowen would purchase pseudoephedrine and Wightman left to go to the pharmacy. Approximately 20 to 30 minutes after completing the purchase and returning home, he was joined by McJunkin and McCowen. Wightman believed that McJunkin drove the Explorer.

## II. PROCEDURAL HISTORY

As discussed, McJunkin appealed his conviction of providing chemicals or laboratory equipment to another person for the manufacturing of controlled substances, arguing, among other things, that the officers' search of the Explorer and seizure of the coffee filters violated his Fourth Amendment rights. This Court disagreed, concluding that Wightman consented to the search of the garage and the officers seized the coffee filters under the plain-view exception to the warrant requirement. *McJunkin I*, unpub op at 3. Rather than grant McJunkin's application for leave to appeal, our Supreme Court vacated this Court's opinion in part, and remanded to the trial court "for an evidentiary hearing to determine whether the consent or the plain view exceptions to the warrant requirement justify the warrantless search and seizure . . . ." *McJunkin II*, 505 Mich at 883. The Michigan Supreme Court instructed the trial court to:

[D]etermine: (1) whether, based on an assessment of the totality of the circumstances, consent was freely and voluntarily given, see *People v Borchard-*

*Ruhland*, 460 Mich 278, 294; 597 NW2d 1 (1999); (2) whether an objectively reasonable officer would conclude that the homeowner had actual or apparent authority to consent to a search of the vehicle that the defendant had driven into the garage, see *People v Mead*, 503 Mich 205, 216-219; 931 NW2d 557 (2019); and (3) whether, assuming the officers were lawfully in the garage, the items seized from the vehicle were visible and their incriminating character was immediately apparent, see *People v Champion*, 452 Mich 92, 101; 549 NW2d 849 (1996). In all other respects, leave to appeal is DENIED, because we are not persuaded that the remaining questions presented should be reviewed by this Court. [*McJunkin II*, 505 Mich at 883.]

## III. PROCEEDINGS ON REMAND

### A. TESTIMONY

On remand, the trial court held four evidentiary hearings over several months. Wightman and Officers Burgess, Ziegler, and Huggett provided inconsistent and sometimes conflicting testimony about the search and seizure. Officers Burgess and Huggett testified that they had extensive experience investigating drug manufacturing cases. According to Officers Burgess and Huggett, a caller reported odd smells coming from a garage on Wightman's property. All three officers testified that, when they responded to the scene, they noticed the smell of ammonia—a substance commonly associated with meth laboratories—coming from Wightman's garage. Like at trial, the officers confirmed that Wightman came out of the garage's side door as they approached on foot.

According to Officer Burgess, from his vantage point outside the garage, he saw McCowen in the garage and he saw McJunkin sitting in the driver's seat of the Explorer. Once the men left the garage, Officer Burgess saw an active one pot through the open door. Officer Burgess testified that an active one pot can explode or catch fire if not properly handled. Officer Huggett testified that an explosion could also place neighboring properties at risk. According to Officer Burgess, before entering the garage, he and Officer Ziegler put on masks "so [they] could safely secure the rest of that garage." Officer Ziegler, however, testified that he and Officer Burgess entered the garage to perform a protective sweep before putting on protective gear. According to Ziegler, he and Officer Burgess first entered the garage, then "[n]oticed a one pot meth lab and immediately went to get protective gear after verifying that there were no people inside the garage."

Officer Burgess testified that, during his initial entry, he noted that the driver's side door to the Explorer was open. Officer Burgess explained that he saw no one else in the open area of the garage, so he approached the Explorer to search for other people. As he did so, Officer Burgess could see inside the open door of the Explorer that McJunkin's identification was on the driver's seat and there was "a ball" of coffee filters protruding out of a cupholder. Officer Burgess believed the coffee filters were evidence of meth manufacturing because he knew from experience that they are used "to filter out the [meth] after the one pot [is] completed." Although Officer Burgess maintained that he saw the coffee filters during his initial entry, he entered the garage a second time to look for additional meth labs because, in his training and experience, "when there is one meth lab, there are multiple." Officer Burgess recalled that, when he finished his sweep to ensure

no other people or meth labs were present, the officers "started digging a little bit deeper and found that that [sic] coffee filter had a white residue. A ground up residue in it."

Officer Huggett testified that he interviewed Wightman while detaining him with McCowen and McJunkin outside the garage. According to Officer Huggett, Wightman said he lived there and he consented to a search of both the house and garage, without any limitations. At the first evidentiary hearing, Officer Huggett testified that this conversation took place in the back of a patrol vehicle. However, a recording of Wightman inside the patrol car did not show him consenting to Officer Huggett's search request, but instead showed Wightman telling another officer that police could search his house.

After reviewing the recording, Officer Huggett changed his testimony and said that Wightman consented to a search of both his house and garage, off-camera and before police placed Wightman in the patrol car. Officer Huggett conceded that his testimony about this separate conversation with Wightman conflicted with his repeated assertions during his earlier testimony that Wightman gave consent in the patrol car. Officer Huggett also admitted that his police report contained no reference to a separate conversation with Wightman about his consent. Also, according to Officer Huggett, he never asked Wightman if police could search the Explorer. Wightman testified that he never gave police consent to search his garage or the Explorer.

In support of McJunkin, Michelle Haidl, a criminal investigator for the Calhoun County Public Defender's Office (CCPDO), testified that she recreated the incident scene using a different model Explorer in the same garage. Haidl placed different white items in the cupholder like coffee filters, Kleenex, paper towels, and tissue paper. Retired police officer Art McClenney testified that it was difficult for him to identify the items through the open door of the vehicle.

## B. ATTORNEYS' ARGUMENTS AND TRIAL COURT'S FINDINGS

The prosecutor argued that Wightman consented to the search of his garage and that the officers reasonably believed that his consent included the vehicle because it was open and appeared to belong to Wightman. According to the prosecutor, even if Wightman did not consent, police entered the garage under exigent circumstances, they saw the coffee filters, and they seized them as apparently incriminating evidence of a component used to manufacture meth. Defense counsel argued that Wightman did not consent to the search of his garage, pointing to inconsistencies in Officer Huggett's testimony. Moreover, according to defense counsel, the plain-view doctrine did not apply because officers could not reasonably identify white paper products "stuffed" in a cup holder as coffee filters or as any other apparently incriminating evidence.

The trial court ruled that the officers lawfully seized the coffee filters because Wightman freely consented to the search. The trial court also ruled that the officers' belief that Wightman's consent included the Explorer was objectively reasonable because the Explorer was inside the closed garage—which would normally only be accessible to a resident or homeowner—and no one told the officers that the vehicle belonged to anyone other than the homeowner. Regarding the plain-view doctrine, the trial court acknowledged Haidl's and McClenney's testimony challenging the officers' ability to recognize the coffee filters, but the court reasoned that the officers did not see them "in a vacuum." Rather, the officers had training and experience in meth investigations and knew that coffee filters are commonly used in one-pot meth labs. The trial court

also emphasized that the officers recognized "the strong smell of a one pot cooking" before entering the garage, and actually saw an active one pot. The trial court concluded that, because the officers saw the coffee filters while they were in plain view, they were legally seized regardless of whether the officers had consent to search the vehicle.

## IV. SEARCH AND SEIZURE

The parties agree that the officers did not have a warrant to search Wightman's garage or the Explorer. McJunkin challenges the trial court's conclusion that the search and seizure was legally justified under the consent and plain-view exceptions to the warrant requirement.

## A. STANDARDS OF REVIEW

We review de novo whether a search or seizure violated the Fourth Amendment and whether an exception to the warrant requirement applies. *People v Hyde*, 285 Mich App 428, 438; 775 NW2d 833 (2009). "This Court reviews a trial court's findings of fact at a suppression hearing for clear error and reviews de novo its ultimate decision on a motion to suppress the evidence." *People v Tavernier*, 295 Mich App 582, 584; 815 NW2d 154 (2012). A trial court's finding is clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake was made after reviewing the whole record. *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008). " 'Resolution of facts about which there is conflicting testimony is a decision to be made initially by the trial court. The trial judge's resolution of a factual issue is entitled to deference. This is particularly true where a factual issue involves the credibility of the witnesses whose testimony is in conflict.' " *People v Farrow*, 461 Mich 202, 209; 600 NW2d 634 (1999), quoting *People v Burrell*, 417 Mich 439, 448; 339 NW2d 403 (1983). Under the clearly erroneous standard of review, this Court must give regard to the "special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). However, "appellate courts need not refrain from scrutinizing a trial court's factual findings, nor may appellate courts tacitly endorse obvious errors under the guise of deference." *People v McSwain*, 259 Mich App 654, 682-683; 676 NW2d 236 (2003) (quotation marks and citation omitted).

## B. LEGAL PRINCIPLES

"Both the United States and Michigan Constitutions guarantee the right against unreasonable searches and seizures." *People v Armstrong*, 344 Mich App 286, 295; 1 NW3d 299 (2022). See US Const, Am IV; Const 1963, art 1, § 11. Searches and seizures must be reasonable, "and in most cases that requires issuance of a warrant supported by probable cause, in order for the results to be admissible." *Armstrong*, 344 Mich App at 295 (quotation marks and citation omitted). "Searches or seizures conducted without a warrant are per se unreasonable, subject to several well-delineated exceptions." *People v Moorman*, 331 Mich App 481, 485; 952 NW2d 597 (2000). "Examples of exceptions to the warrant requirement are: (1) searches incident to arrest, (2) automobile searches and seizures, (3) plain view seizure, (4) consent, (5) stop and frisk, and (6) exigent circumstances." *People v Davis*, 442 Mich 1, 10; 497 NW2d 910 (1993).

Accordingly, "to show that a search was in compliance with the Fourth Amendment, the police must show either that they had a warrant or that their conduct fell within one of the narrow,

specific exceptions to the warrant requirement." *People v Moorman*, 331 Mich App 481, 485; 952 NW2d 597 (2000). The government bears the burden of showing that an exception to the warrant requirement applied to the search and seizure. *People v Cartwright*, 454 Mich 550, 561; 563 NW2d 208 (1997). And even when an exception to the warrant requirement applies, the search itself must still be reasonable. *Id*. at 558. "Reasonableness is measured by examining the totality of the circumstances . . . . [and] is a fact-intensive inquiry that does not lend itself to resolution through the application of bright-line rules." *People v Williams*, 472 Mich 308, 314; 696 NW2d 636 (2005) (quotation marks and citations omitted).

## C. CONSENT EXCEPTION TO THE WARRANT REQUIREMENT

McJunkin argues the trial court erred by holding that Wightman freely and voluntarily consented to a search of the garage, and also erred by ruling that an objectively reasonable police officer would have concluded that Wightman's consent extended to the Explorer. It is uncontested that McJunkin never consented to a search of the Explorer. Therefore, it is Wightman's consent—and the scope of that consent—that is at issue in this case.

Consent that "is unequivocal, specific, and freely and intelligently given" is an exception to the warrant requirement. *People v Galloway*, 259 Mich App 634, 648; 675 NW2d 883 (2003). "Whether consent to search is freely and voluntarily given presents a question of fact that must be determined on the basis of the totality of the circumstances." *People v Mahdi*, 317 Mich App 446, 461; 894 NW2d 732 (2016). Generally, "consent must come from the person whose property is being searched or from a third party who possesses common authority over the property. 'Common authority' is based on mutual use of the property by persons generally having joint access or control for most purposes . . . ." *People v Brown*, 279 Mich App 116, 131; 755 NW2d 664 (2008) (quotation marks and citations omitted). However, even if the third party does not have authority to consent to a search, the search may still be "valid if the police officer's belief in the authority to consent was objectively reasonable." *Id*. The scope of a person's consent to search is determined under an objective standard; the scope is what the typical reasonable person would have understood it to be under the circumstances. *People v Frohriep*, 247 Mich App 692, 703; 637 NW2d 562 (2001). Notably, "the consent of a third party does not render a search valid if the other party is present and expressly objects to the search." *Brown*, 279 Mich App at 131-132.

In this case, the trial court found that Officer Huggett received consent from Wightman to search the garage and that, therefore, the officers' entry into and search of the garage was reasonable. In so holding, the trial court credited Officer Huggett's testimony over Wightman's assertion that he never consented to the search. The trial court explained:

> At the evidentiary hearing, Wightman testified that he did not give consent to search the garage or his property.
>
> At the evidentiary hearing on March 4, 2021, Officer Huggett testified that he believed that his conversation with Wightman regarding consent to search took place in a patrol car. The video was admitted by [McJunkin] at the evidentiary hearing. On the video, it is clear that the officers are speaking with Wightman by a patrol car but before the audio is turned on. Once Wightman is seated in the patrol car, there is audio but it is very hard to discern the conversation between Wightman

and the officer over the radio traffic. At one point however, near 2 40, the officer asks Wightman if he is "ok with us going through the house?" Wightman responds, "Yes." There is nothing in the record or on the video to suggest that at the time of the conversation, Wightman was threatened or coerced. Wightman was later advised of his [*Miranda*] Rights and voluntarily spoke to Officer Huggett. Given the inconsistency of Wightman's testimony and the fact that he gave permission to search his home, his statement at the evidentiary hearing that he didn't give consent lacks credibility. Rather, the evidence is consistent with the officer's testimony that he was given consent to search the garage and home.

As the trial court explained, it based its finding of consent on Wightman's inconsistent testimony, other evidence that supported Officer Huggett's version of events, and Officer Huggett's credibility.

We hold that the trial court clearly erred by ruling that Wightman freely and unequivocally consented to the search of his garage because the ruling was based on factual findings that were not supported by the evidence. Contrary to the trial court's finding, Wightman did not give inconsistent testimony about consent. Wightman testified at the evidentiary hearing that he never gave officers consent to search the garage or the Explorer and he did not waiver on that point. Accordingly, there was no basis for the trial court to rule that Wightman's testimony was inconsistent. Further, that Wightman gave police consent to search his house but not his detached garage was a choice, not an inconsistency.

Secondly, the trial court clearly erred when it found that other evidence supported Officer Huggett's testimony that Wightman consented to the search of his garage. As discussed, Officer Huggett repeatedly testified that Wightman consented to the search of his house and garage while Wightman was sitting in the back of the police car. When he realized that the video recording contradicted his testimony by showing Wightman only consenting to a search of his house, Officer Huggett changed his testimony and said that Wightman consented to the search of his house and garage *before* Wightman sat in the patrol car. Thus, not only did Officer Huggett offer inconsistent testimony about Wightman's consent, the video evidence did not support Officer Huggett's version of events, but instead supported Wightman's assertion that he only consented to a search of his house.

The video evidence further contradicted the officers' claims that they searched the car pursuant to Wightman's consent because, at the start of the audio, Officer Huggett asked Wightman his address and, after he gave it, another officer asked Wightman if this was his house. Wightman confirmed that it was his house and, shortly thereafter, an officer stated over the radio that they were just about done with the garage and were trying to find the homeowner to see if they could search the house. From this evidence, it is apparent that the officers did not have Wightman's consent to search the garage before they did so. Indeed, the video shows that the officers learned Wightman's address and realized it was his house only *after* the officers entered and searched the garage.

The trial court reasoned that the video showed officers speaking to Wightman near a patrol car before the audio was turned on and that this supported Officer Huggett's changed testimony that Wightman consented to the search before he got into the patrol car. Although the trial court

was correct that the video shows someone standing with two officers outside the patrol car, the person depicted is not Wightman. Contrary to the trial court's finding, the video in fact provides no insight into Officer Huggett's alleged interaction with Wightman before Wightman sat in the police car because it does not show Officer Huggett speaking to Wightman at that time. To the extent the court relied on this to find that other evidence supported Officer Huggett's changed testimony, we are left with a firm conviction that the trial court erred. Simply stated, no surrounding evidence supported Officer Huggett's claim that Wightman consented to the search of his garage.

Although we normally defer to the trial court for determinations of credibility, we cannot do so when its determination is based on clearly erroneous findings of fact. Indeed, it would be our own error to "tacitly endorse obvious errors under the guise of deference," *McSwain*, 259 Mich App at 682-683. To that end, we further note that, not only did Officer Huggett materially change his testimony about Wightman's consent during the evidentiary hearing, he made various assertions that conflicted with his testimony at trial regarding his own entry into the garage and observation of the evidence.

Based on these errors, we conclude that the totality of the circumstances did not support a finding that the officers had consent to search the garage. As discussed, to establish the consent exception to the warrant requirement, evidence must show that the officers received consent that "is unequivocal, specific, and freely and intelligently given." See *Galloway*, 259 Mich App at 648. The evidentiary hearing disclosed no consent to search the garage that meets any of those criteria and, therefore, we reverse the trial court's decision.

## D. EXIGENT CIRCUMSTANCES AND PLAIN VIEW

The prosecutor maintains that the police officers were lawfully in the garage under the exigent circumstances exception to the warrant requirement and then saw and seized the coffee filters under the plain view doctrine. Under the exigent-circumstances exception, police may enter a dwelling

> if the officers possess probable cause to believe that a crime was recently committed on the premises, and probable cause to believe that the premises contain evidence or perpetrators of the suspected crime. The police must further establish the existence of an actual emergency on the basis of specific and objective facts indicating that immediate action is necessary to (1) prevent the imminent destruction of evidence, (2) protect the police officers or others, or (3) prevent the escape of a suspect. If the police discover evidence of a crime following the entry without a warrant, that evidence may be admissible. [*In re Forfeiture of $176,598*, 443 Mich 261, 271; 505 NW2d 201 (1993).]

"Probable cause exists when the facts and circumstances known to the police officers at the time of the search would lead a reasonably prudent person to believe that a crime has been or is being committed and that evidence will be found in a particular place." *People v Beuschlein*, 245 Mich App 744, 750; 630 NW2d 921 (2001). A recognized exigency exists "where there is a risk of danger to the police or others inside or outside a dwelling." *People v Henry (After Remand)*, 305 Mich App 127, 138; 854 NW2d 114 (2014). "[I]mminent and ongoing danger to the health"

of people . . . is considered a serious consequence warranting the application of the exigent-circumstances doctrine." *United Pet Supply, Inc v City of Chattanooga*, 768 F3d 464, 490 (CA 6, 2014).

We agree that the evidentiary hearing established that Officers Burgess and Ziegler were lawfully in the garage when they saw the coffee filters because they entered the garage to address an immediate risk of harm to human life. Undisputed evidence showed that the officers entered the garage to secure an active one-pot meth lab that was visible through the open door, to ensure the garage was free of other immediately-dangerous chemical processes, to ventilate the area, and to sweep the garage for suspects who might pose a risk to officers or who might be harmed by a chemical fire or explosion. Based on the smells coming from the garage and the presence of the active one-pot, it was reasonable for the officers to believe that McJunkin, McCowen, and Wightman were manufacturing meth and it was reasonable for them to enter the garage to secure the one-pot out of caution for themselves and others in the area.

Notwithstanding differing testimony about consent, when police reasonably entered the garage to prevent potential loss of life and destruction of evidence, exigent circumstances excused their warrantless entry into the garage. See *id*. at 851. See also *Henry (After Remand)*, 305 Mich App at 138. The plain-view exception to the warrant requirement "allows police officers to seize, without a warrant, items in plain view if the officers are lawfully in a position from which they view the item, and if the item's incriminating character is immediately apparent." *People v Champion*, 452 Mich 92, 101; 549 NW2d 849 (1996). "No searching, no matter how minimal, may be done under the auspices of the plain[-]view doctrine." *Id*. An item's incriminating character is immediately apparent if "without further search the officers have probable cause to believe the items are seizable." *Mahdi*, 317 Mich App at 462, quoting *Champion*, 452 Mich at 102 (quotation marks omitted). Exigent circumstances may provide officers with the lawful right of access to an object in plain view. *United Pet Supply*, 768 F3d at 489-490.

According to Officer Burgess, it was during his initial entry into the garage that he checked the Explorer for other suspects and saw the coffee filters in the cup holder. Officer Burgess testified that coffee filters are common in one-pot construction. Although the filters themselves were not inherently illegal, Officer Burgess could have reasonably believed they were being used for an unlawful purpose.

However, plain view relates to the seizure of evidence and, alone, never operates to permit a search or seizure absent some other exception to the warrant requirement. *Coolidge v New Hampshire*, 403 US 443, 468; 91 S Ct 2022; 29 L Ed 2d 564 (1971). We hold that the officers could not lawfully seize the coffee filters without a warrant because, regardless whether the coffee filters were visible and incriminating, no exception to the warrant requirement permitted their seizure. First, although exigent circumstances excused the officers' warrantless entry into the garage, none of the exigent circumstances related to an entry into or search of the Explorer. No evidence suggested any active meth labs were inside the Explorer or that police had to otherwise enter the vehicle to make the area safe.

Further, it is well-settled that a protective sweep must be "quick and limited, and conducted for the sole purpose of ensuring the safety of the police officers and other persons." *People v Cartwright*, 454 Mich 550, 557, 563 NW2d 208 (1997). Indeed, an entry for this purpose is "not

a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Maryland v Buie*, 494 US 325, 335-336; 110 S Ct 1093; 108 L Ed 2d 276 (1990). Once the danger is eliminated police officers may not search the premises without a warrant. *Vale v Louisiana*, 399 US 30, 34-36; 90 S Ct 1969; 26 L Ed 2d 409 (1970).

The plain-view exception requires not only that police are in a lawful position from which they can see an apparently incriminating object, the officers must have a lawful right of access to the object. *Champion*, 452 Mich at 104. For the reasons stated, we disagree with the trial court's finding that Wightman consented to a search of the garage, but even if he did, no one consented to a search of the vehicle. No reasonable officer would have considered the Explorer part of a consensual search of the garage because officers saw that McJunkin was sitting in the vehicle when police arrived, he had evidently driven it into the garage, and his identification was plainly visible on the driver's seat when he got out of the vehicle. *People v Mead*, 503 Mich 205, 216; 931 NW2d 557 (2019). Wightman had no actual or apparent authority to consent to a search of the vehicle, which made any search of the vehicle invalid. *Id*. at 216-218.

Further, this is not a situation in which the coffee filters could be seized under the exigent circumstances exception on the ground that they were at risk of being destroyed. See, e.g., *Barton v Martin*, 949 F 3d 938, 948 (CA 6, 2020). To the contrary, once police secured the one-pot meth lab and swept the area for other labs and suspects, any exigent circumstances were resolved and there was no reason to seize items that may have been incriminating, but were at no risk of causing harm or of being destroyed themselves.

Officer Burgess testified that he could plainly see the coffee filters through the open door of the Explorer. The officers also testified that they had enough training and experience to recognize the coffee filters as incriminating because they are commonly used to make meth and the garage contained an active meth lab. We have no doubt that, on these bases, the officers had probable cause to believe the coffee filters were incriminating and important evidence. However, " 'plain view alone is never enough to justify the warrantless seizure of evidence . . . [and] no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' " *Hopkins v Nichols*, 37 F 4th 1110, 1118 (CA 6, 2022), quoting *Coolidge*, 403 US at 468. Rather, the Fourth Amendment would only permit the seizure of the coffee filters "if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *Hopkins,* 37 F 4th at 1117. Simply stated, " 'if the police had probable cause to believe they would find the evidence or contraband [b]efore making the seizure, and had an opportunity to obtain a warrant, any exigency which results is of their own making, and cannot serve as grounds for a warrantless seizure.' " *Id.*, quoting *United States v Hare*, 589 F2d 1291, 1294 (CA 6, 1979). Because the police officers lack exigent circumstances when they seized the coffee filters without a warrant, they violated defendant's Fourth Amendment rights.

For these reasons, the trial court erred by ruling that the consent and plain-view exceptions to the Fourth Amendment warrant requirements applied to the officers' seizure of evidence from McJunkin's vehicle.

## V. STANDARD 4 BRIEF

In a supplemental Standard 4[1] brief, McJunkin also raises several challenges to procedures employed at his trial and sentencing, the sufficiency of the evidence presented to the jury, the jury instructions, his sentencing enhancement, and the effectiveness of his counsel *at trial*. "When a case is remanded by an appellate court, proceedings on remand are limited to the scope of the remand order." *People v Canter*, 197 Mich App 550, 567; 496 NW2d 336 (1992). If "an appellate court remands for some limited purpose following an appeal as of right in a criminal case, a second appeal as of right, limited to the scope of the remand, lies from the decision on remand." *People v Kincade (On Remand)*, 206 Mich App 477, 481; 522 NW2d 880 (1994). A second appeal is therefore limited by the scope of the remand. *People v Jones*, 394 Mich 434, 436, 231 N.W.2d 649, 650 (1975).

As stated above, McJunkin filed his first appeal by right in 2018 and we affirmed. See *McJunkin I*, unpub op at 1. The Michigan Supreme Court vacated our opinion in part, and remanded to the trial court for an evidentiary hearing to determine whether the consent and plain-view exceptions to the Fourth Amendment warrant requirement applied to this case. *McJunkin II*, 505 Mich at 883. Because the outstanding issues McJunkin raises in his Standard 4 brief are beyond the scope of the Court's remand order, they are not properly before us. See *Canter*, 197 Mich App at 567. See also *Kincade (On Remand)*, 206 Mich App at 481.[2]

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Kristina Robinson Garrett

---

[1] A "Standard 4 brief" is a brief filed by a criminal defendant *in propria persona* against the advice of counsel under our Supreme Court's Administrative Order No. 2004-6, Standard 4, 471 Mich *c*, *cii* (2005).

[2] We also note that several of McJunkin's Standard 4 arguments were raised in his prior appeal and decided on the merits by this Court. Because McJunkin has established neither a change in the material facts nor a change in the law since our previous decision, see *Duncan v Michigan*, 300 Mich App 176, 189; 832 NW2d 761 (2013), those issues are governed by the law-of-the-case doctrine, see *Grievance Administrator v Lopatin*, 462 Mich 235, 259; 612 NW2d 120 (2000). We have also considered McJunkin's arguments that he did not previously raise and have concluded that they lack merit.